[Cite as *State v. Tibbs*, 2011-Ohio-6716.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-100378 |
| | | TRIAL NO. B-0709740 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| YVAN TIBBS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 28, 2011

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *James Michael Keeling*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Christine Y. Jones*, for Defendant-Appellant.

Please note: This case has been removed from the accelerated calendar.

**CUNNINGHAM**, **Judge.**

{¶1}    Defendant-appellant Yvan Tibbs appeals from his convictions, following a jury trial, for the aggravated robbery and the aggravated murder of John Newell.  Tibbs and Eddie Mitchell arranged to meet Newell in a parking lot to rob him of nearly 400 Ecstasy tablets.   When Newell resisted, Tibbs used the .357-caliber revolver that Mitchell had given him to fire at least four shots, three into Newell's face and head, killing him.

{¶2}    Tibbs argues in his seven assignments of error that (1) the trial court erred by overruling his motion to suppress statements made to the police, (2) the prosecution exercised its peremptory challenges in a discriminatory manner, (3) his convictions were contrary to the manifest weight of the evidence and were based upon insufficient evidence, (4) the trial court erred by imposing multiple punishments for one crime, and (5) the trial court imposed an excessive sentence.  We find none of the assignments to have merit and affirm the trial court's judgment.

### I.   The Killing of John Newell

{¶3}    Throughout the day of October 6, 2007, Mitchell and Tibbs had been communicating over their cellular telephones.  That evening, Mitchell drove his Monte Carlo automobile and picked up Tibbs.  The two traveled to the Brookview Apartments, in Lockland, Ohio, to visit Newell, a man that Mitchell knew well.  Newell was known to sell drugs and the two often provided each other with firearms.  Mitchell declared that he intended to rob Newell.  He provided Tibbs with a .357-caliber revolver.

{¶4}    Newell had parked his Cadillac sedan near a dumpster in the apartment-complex parking lot.  At approximately 10:30 p.m., Mitchell pulled into the parking lot and parked near Newell's vehicle.  Witnesses observed two or three men talking near the dumpsters.  Upon a prearranged signal, transmitted by text message, Mitchell and Tibbs transformed the meeting to purchase drugs into a robbery.

{¶5}    But the plan did not go as smoothly as Mitchell and Tibbs had hoped. Newell was armed with a .40-caliber semiautomatic pistol. Tibbs told police investigators that Newell, standing outside his car, had resisted and had shot first. A bullet hole was found in the driver's side door of Mitchell's vehicle. Tibbs recounted that he had then fired a single shot at Newell and "took off running." At trial, however, Tibbs denied firing at Newell and claimed to have remained in Mitchell's car throughout the shooting.

{¶6}    Joseph Davidson, an apartment resident, testified that he had heard a single shot and had then observed men fleeing from the dumpster. Lillian Peters and Vivian Ford had just returned to the apartment complex from grocery shopping. Peters saw several men talking near the dumpster. She heard shooting and saw two men run in different directions. Ford saw flashes of light from the gun held by one of the perpetrators. She reported hearing three gunshots and then seeing the two men running away. She summoned the police.

{¶7}    Investigating officers found Newell fatally shot, reclining in the front seat of his Cadillac. The deputy coroner reported that Newell had been struck by at least four bullets—three in the face or head and one in the arm and chest. Police found an unloaded Smith & Wesson revolver in the woods near the parking lot. The weapon was capable of firing .357- or .38-caliber rounds. The gun contained smears of Newell's blood. The police also discovered a bag of pills and currency covered in Newell's blood.

{¶8}    Ford also described how one of the perpetrators—Mitchell—returned to the scene and was apprehended by the police. Although he had returned just minutes after Newell's murder, Mitchell's hands contained no gunshot residue.

{¶9}    Tibbs was located at his grandmother's home one month later. Police had found Tibbs by tracing records of Mitchell's telephone calls that evening. Tibbs

claimed to have recently purchased the traced cellular telephone from an individual identified only as "Ton." Police investigators took Tibbs into custody and questioned him about the events in the Broadview parking lot. A tape recording made at the end of that questioning was played for the jury at trial.

{¶10} At the conclusion of five days of testimony, the jury found Tibbs guilty of aggravated felony murder in violation of R.C. 2903.01(B), aggravated robbery in violation of R.C. 2911.01(A)(3), and accompanying firearm specifications. At sentencing, the trial court imposed a 20-year-to-life prison sentence for aggravated felony murder and made that term consecutive to a maximum, 10-year prison term for aggravated robbery and to a single three-year term for a firearm specification accompanying the murder offense. The aggregate prison sentence was 33 years to life. This appeal ensued.

## II. Pretrial Challenges

{¶11} For clarity, we will address Tibbs' assignments of error in temporal order.

{¶12} In his sixth assignment of error, Tibbs contends that the trial court erred in denying his motion to suppress statements made by him to police officers. Tibbs' tape-recorded statement to police, in which he admitted robbing and shooting Newell, was played for the jury during the trial. Tibbs argues that, despite his signature on the waiver-of-rights form, he did not voluntarily and knowingly waive his right to remain silent under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602. He asserts that his young age and his limited intelligence prevented him from properly waiving that right. He also notes that the tape recording does not include a statement by police informing him of his *Miranda* rights.

{¶13} We review a trial court's ruling on a motion to suppress in a two-step process. See *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307; 897 N.E.2d 629, ¶49

et seq. First, we must accept the trial court's findings of historical fact if they are supported by competent, credible evidence. See *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶8. Then this court must make an independent determination, as a matter of law, without deference to the trial court's legal conclusions, whether those facts meet the applicable constitutional standards. See id; see, also, *State v. Winfrey*, 1st Dist. No. C-070490, 2008-Ohio-3160, ¶19.

{¶14} The state bears the burden of demonstrating by a preponderance of the evidence that Tibbs' statement was voluntary. See *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶17. "In determining whether a juvenile's statements have been voluntarily made, a court must consider 'the totality of the circumstances, including the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; and the existence of physical deprivation or inducement.' " *State v. Winfrey* at ¶25, quoting *In re Watson* (1989), 47 Ohio St.3d 86, 548 N.E.2d 210, paragraph one of the syllabus; see, also, *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶32. The same considerations apply to whether a defendant voluntarily, knowingly, and intelligently waived his rights. *State v. Leonard* at ¶32. Evidence of police coercion or overreaching is a necessary predicate for a finding of involuntariness. See *State v. Hill*, 64 Ohio St.3d 313, 318, 1992-Ohio-43, 595 N.E.2d 884, citing *Colorado v. Connelly* (1986), 479 U.S. 157, 164, 107 S.Ct. 515.

{¶15} At a hearing on Tibbs' motion to suppress, the investigating officer, Detective Steven Minnich of the Hamilton County Sheriff's Department, testified that he and Detective Todd Ober of the Lockland police department had interrogated Tibbs from 1:15 p.m. until 4:00 p.m. on November 5, 2007. The less-than-three-hours of questioning included the time to record the taped statement. Detective Minnich stated that he had advised Tibbs of his rights against self incrimination, verbally and in written form, prior to questioning. Tibbs had acknowledged that he

5

could read and write, and that he was not under the influence of alcohol or drugs before signing the form. Detective Minnich indicated that he had offered Tibbs food and drink and the opportunity to use a bathroom during the questioning.

{¶16}   There was ample competent, credible evidence adduced at the hearing to support the trial court's legal decision that Tibbs had been properly advised of his *Miranda* rights and that he understood those rights when he signed the waiver form.

{¶17}   First, a signed waiver form is strong proof of the validity of the waiver. See *State v. Nields*, 93 Ohio St.3d 6, 19, 2001-Ohio-1291, 752 N.E.2d 859. And there was no evidence of police coercion or overreaching during the brief interrogation. The trial court opted to believe Detective Minnich's testimony. At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trial court to determine. See *State v. Hill*, 73 Ohio St.3d 433, 446, 1995-Ohio-287, 653 N.E.2d 271.

{¶18}   While Tibbs was only 15 years old at the time of the interrogation, his young age, by itself, does not render his waiver involuntary. See *In re Watson*, 47 Ohio St.3d at 89, 548 N.E.2d 210 (holding a 14-year-old aggravated-murder suspect's statements to be voluntary); see, also, *State v. Winfrey* at ¶20 et seq. (holding a 16-year-old aggravated-murder suspect's statements to police to be voluntary). Under the totality of the circumstances, we conclude that his age did not hamper his ability to act knowingly and voluntarily. Tibbs had been subjected to police questioning before. He had been adjudicated delinquent for drug possession, and he had been questioned about a different murder only months before this interrogation. See *State v. Winfrey* at ¶20. Tibbs' speech on the recording was marked by street patois, but he responded in a logical manner to the officers' questions and even offered factual corrections to the officers' narrative of the events surrounding Newell's murder. See *State v. Winfrey* at ¶20 et seq.

{¶19}   While this court has previously noted that it is the better practice to include a recitation of rights on the recorded statement, we now hold it was not error to fail to do so where Detective Minnich's unrebutted testimony and the signed waiver form indicate compliance with the constitutional guarantees.   See *State v. Cedeno* at ¶13.

{¶20}   Based upon the evidence presented, we hold that the trial court was justified in finding that Tibbs had been properly advised of his rights prior to making his statements and that he had knowingly waived those rights. The sixth assignment of error is overruled.

{¶21}   In his seventh assignment of error, Tibbs asserts that the state peremptorily challenged two African-American prospective jurors because of their race, in violation of the rule of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712. Tibbs had objected to the challenges at trial.

{¶22}   *Batson* created a three-part test for determining whether the state's use of a peremptory challenge was racially motivated.  "First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination.  Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination."   *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶61.  A trial court's determination that the challenge was not motivated by a discriminatory intent will not be reversed on appeal unless it is clearly erroneous.  See *State v. Hernandez* (1992), 63 Ohio St.3d 577, 583, 589 N.E.2d 1310, following *Hernandez v. New York* (1991), 500 U.S. 352, 111 S.Ct. 1859.

{¶23}   We note that the initial explanation for these challenges offered by the state at trial and again in this appeal—that Tibbs has not established a pattern of discriminatory exclusion based on race and that other African-Americans remained

on the jury—is "not a facially valid race-neutral justification for a peremptory strike" and has been rejected by this court and by the Ohio Supreme Court. *State v. Walker* (2000), 139 Ohio App.3d 52, 56, 742 N.E.2d 1173; see, also *State v. White*, 85 Ohio St.3d 433, 436, 1999-Ohio-281, 709 N.E.2d 140 ("reject[ing] [the] view" that where there is no pattern of discrimination, there is no *Batson* violation). "The exercise of even one peremptory challenge in a purposefully discriminatory manner is a violation of equal protection." *State v. Taylor*, 1st Dist. No. C-020475, 2004-Ohio-1494, ¶20, citing *State v. Gowdy*, 88 Ohio St.3d 387, 2000-Ohio-355, 727 N.E.2d 579.

{¶24} But the state's subsequent race-neutral explanations for striking both prospective jurors demonstrated the absence of discriminatory intent in its use of peremptory challenges. The record reveals that the state struck prospective juror number 13 because he had been familiar with the neighborhood where Newell had been murdered. Since he knew of the street toughs in that area, he might have become subject to inappropriate pressure from them. The prospective juror also had a previous conviction for improper handling of a firearm. See *State v. Greene*, 2nd Dist. No. 24307, 2011-Ohio-4541, ¶11; see, also, *United States v. Brown* (C.A.7, 2002), 289 F.3d 989, 993.

{¶25} The state justified its challenge of prospective juror number 19 because he had been untruthful about his criminal record, which included charges of aggravated burglary and tax evasion. A juror's lack of candor or dishonesty in voir dire is a valid race-neutral reason for challenging that juror. See *State v. Jordan*, 167 Ohio App.3d 157, 2006-Ohio-2759, 854 N.E.2d 520, ¶39. Consequently, we cannot say that the trial court erred in overruling Tibbs' objections to the state's preemptory challenges.

{¶26}   Tibbs' second contention, that the state's use of a database to check the criminal record of prospective jurors violated Tibbs' constitutional rights, must fail on the authority of *State v. Jordan* at ¶39 et seq.

{¶27}   The seventh assignment of error is overruled.

### III. Sufficiency- and Weight-of-the-Evidence Claims

{¶28}   In three interrelated assignments of error, Tibbs challenges the weight and the sufficiency of the evidence adduced at trial to support his convictions. Tibbs was convicted of aggravated felony murder under R.C. 2903.01(B), which proscribes "purposely caus[ing] the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery."  A person acts purposely when he specifically intends to cause a certain result.  See R.C. 2901.22(A); *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶188.  Intent to kill may be proved by inference and "may be inferred in a[n] [aggravated] felony-murder when the offense and the manner of its commission would be likely to produce death."  *State v. Garner*, 74 Ohio St.3d 49, 60, 1995-Ohio-168, 656 N.E.2d 623; see, also*, State v. McCoy*, 1st Dist. No. C-090599, 2010-Ohio-5810, ¶36.

{¶29}   The aggravated-robbery charge against Tibbs was governed by R.C. 2911.01(A)(3).  Under this statute, the state was required to prove that Tibbs or his accomplice, in attempting or committing a theft offense, inflicted, or attempted to inflict, serious physical harm on another.

{¶30}   Our review of the entire record fails to persuade us that the jury, acting as the trier of fact, clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.  See *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.  We can find no basis in this record to conclude that this is "an exceptional case" in which the jury lost its way.  *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717.  The jury was entitled to reject

Tibbs' explanation, made to the jury at trial, that he had innocently accompanied Mitchell to the apartment complex without any knowledge of a plan to rob Newell, that he had remained in Mitchell's car, that he had heard shots when Mitchell and Newell confronted each other, and that he had run away after hearing the shots. Tibbs' theory of defense rested largely on his trial testimony, his characterization that there was little physical evidence linking him to the crimes, and his argument that the credibility of the eyewitnesses was undermined due to conflicts among their testimony such as the differing claims as to the number of shots fired.

{¶31} The state presented ample evidence to support the convictions, including Tibbs' own statement to Detective Minnich that he had shot Newell. The state introduced substantial physical and testimonial evidence that Tibbs had purposely killed Newell when he had resisted the theft of the Ecstasy tablets. Telephone records reflected communications between Tibbs and Mitchell before and during the confrontation with Newell. Tibbs admitted accompanying Mitchell to the parking lot.

{¶32} In his taped statement to police, Tibbs acknowledged Mitchell's plan to rob Newell. He recounted that, after Newell fired, Tibbs had fired a single shot at Newell before fleeing. Though Tibbs claimed, at trial, to have remained in Mitchell's car throughout the fatal encounter, Tibbs' fingerprints were found on the outside of the passenger's window of Newell's car.

{¶33} Witnesses saw the shooting and described two men fleeing in different directions. Mitchell, whose car remained in the parking lot, had returned to the parking lot and was apprehended by the police. Although he had returned just minutes after the shooting, Mitchell's hands contained no gunshot residue, indicating that the other perpetrator—Tibbs—had fired the fatal shots at Newell.

Police located a .357-caliber revolver smeared with Newell's blood in the bushes near the parking lot.

{¶34} The postmortem examination revealed that Tibbs had shot Newell at least four times at relatively close range—three shots striking Newell in the head or face and one penetrating his arm and chest. The deputy coroner described the fatal wound as a shot striking Newell's head under his right eye. The bullet caused extensive damage to Newell's upper spinal cord and brainstem.

{¶35} While there may have been some inconsistencies in some of the witnesses' testimony, these inconsistencies did not significantly discredit their testimony and were to be anticipated when ordinary citizens observed rapidly occurring and shocking events like a drug-related robbery and killing in an apartment-complex parking lot. As the weight to be given the evidence and the credibility of the witnesses were for the jury, sitting as the trier of fact, to determine, in resolving conflicts and limitations in the testimony, the jury could have found that Tibbs had used a deadly weapon to rob Newell and had purposely caused his death while committing that aggravated robbery. See R.C. 2903.01(B) and 2911.01(A)(3); see, also, *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.

{¶36} When reviewing the legal sufficiency of the evidence to support a criminal conviction, we must examine the evidence admitted at trial in the light most favorable to the prosecution and determine whether the evidence could have convinced any rational trier of fact that the essential elements of the crime were proven beyond a reasonable doubt. See *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶36; see, also, *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781. In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the

credibility of the witnesses, as both are functions reserved for the trier of fact. See *State v. Willard* (2001), 144 Ohio App.3d 767, 777-778, 761 N.E.2d 688; see, also, *State v. Campbell*, 1st Dist. No. C-100427, 2011-Ohio-3458.

{¶37} Here, the record reflects substantial, credible evidence from which the triers of fact could have reasonably concluded that all elements of the charged crimes had been proved beyond a reasonable doubt, including that Tibbs had killed Newell during an aggravated robbery and, from the manner of the killing—multiple gunshots fired from close range into the victim's head and face—that Tibbs had specifically intended to cause death. See *State v. Baron*, 1st Dist. No. C-100474, 2011-Ohio-3204, ¶8; see, also, State *v. Conway* at ¶36.

{¶38} Moreover, the trial court also could have properly denied Tibbs' motion for judgment of acquittal, as reasonable minds could have reached different conclusions as to whether each element of the crimes charged had been proved beyond a reasonable doubt. See Crim.R. 29; see, also, *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 381 N.E.2d 184. The first, second, and third assignments of error are overruled.

### IV. A Separate Animus for Purposeful Killing

{¶39} In his fifth assignment of error, Tibbs argues that his convictions for aggravated felony murder and aggravated robbery were allied offenses of similar import subject to merger, committed neither separately nor with a separate animus as to each. Therefore, he contends, the trial court violated the protections of R.C. 2941.25, Ohio's multiple-count statute, by sentencing him for both offenses. We disagree.

{¶40} We note that Tibbs did not object at the sentencing hearing to the imposition of multiple sentences. He has therefore waived this issue absent a showing of plain error. See *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d

923, ¶31; see, also, Crim.R. 52(B); *State v. Drummonds*, 1st Dist. No. C-110011, 2011-Ohio-5915, ¶4.

{¶41} While R.C. 2941.25 has never been amended, the Ohio Supreme Court has abandoned its prior abstract-elements comparison test for determining when two offenses are allied and subject to merger. See *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus. The focus of our inquiry is now on the conduct of the accused as demonstrated by the evidence adduced at trial. See id. at ¶44; see, also, *State v. Mackey*, 1st Dist. Nos. C-100311, C-100312, C-100313, and C-100314, 2011-Ohio-2529, ¶16.

{¶42} Under R.C. 2941.25, a trial court, in a single proceeding, may convict and sentence a defendant for two or more offenses having as their genesis the same criminal conduct or transaction, if the offenses (1) were not allied offenses of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense. See *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 65-66, 461 N.E.2d 892 (internal quotation and citations omitted); see, also, *State v. Johnson* at ¶51.

{¶43} Tibbs had been charged with aggravated felony murder, under R.C. 2903.01(B). That offense required that Tibbs have the specific intent or purpose to kill. See *State v. Baron* at ¶30. It is clear that Tibbs' immediate motive in going to the parking lot was the theft, at gunpoint, of Newell's drugs. But evidence of the manner in which Tibbs had shot Newell in the face and head from relatively close range demonstrated a specific intent to kill Newell, separate from the immediate motive of robbing him. See *State v. Garner*, 74 Ohio St.3d at 60, 1995-Ohio-168, 656 N.E.2d 623; see, also, *State v. Chaffer*, 1st Dist. No. C-090602, 2010-Ohio-4471, ¶11.

{¶44} The jury had been instructed, in accordance with Ohio Jury Instructions 417.01, and without objection, on what use to make of that evidence in reaching a verdict on the aggravated-felony-murder offense. The trial court

13

informed the jury that "[p]urpose is an essential element of the offense of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause the death of John Newell.

{¶45} "Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or in engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.

{¶46} "The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means used and all the other facts and circumstances in evidence.

{¶47} "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, purpose to cause the death may be, but is not required to be, inferred from the use of the weapon. The inference, if made, is not conclusive."

{¶48} The jury returned a guilty verdict on that offense. The trial court entered a judgment of conviction on that verdict. And we have ratified that judgment by rejecting Tibbs' weight- and sufficiency-of-the-evidence assignments of error. Where, as here, the offender's conduct demonstrated a purpose—a specific intent—to kill while, or in the course of, committing an aggravated robbery, we hold that the two offenses were committed with a separate animus and thus were separately punishable under R.C. 2941.25(B).

{¶49} This holding is consistent with the long line of our cases and those of the Ohio Supreme Court, resolved under the various pre-*Johnson* tests, holding that the commission of aggravated felony murder is "never merely incidental" to the

14

commission of the underlying charged felony and permitting multiple punishments. *State v. Moss* (1982), 69 Ohio St.2d 515, 520, 433 N.E.2d 181; see, also, *State v. McCoy*, at ¶62, fn. 25. It is also consistent with cases applying *State v. Johnson*. See *State v. Baron* at ¶30; see, also, *State v. Brenson*, 5th Dist. No. 09-CA-18, 2011-Ohio-1880.

{¶50} Because Tibbs committed these offenses with a separate animus for each offense, the trial court properly convicted and sentenced him for aggravated felony murder and aggravated robbery. Since the trial court did not err, much less commit an obvious and outcome-determinative error, in entering multiple convictions, the fifth assignment of error is overruled. See Crim.R. 52(B).

## V. The Sentences Were Not Excessive

{¶51} Finally, Tibbs argues that the trial court erred in imposing an excessive sentence. He contends that as Newell had shot first, thus provoking Tibbs to fire, and that Tibbs was only 15 years old when he committed these offenses, the trial court should have imposed a more lenient sentence. We conduct a two-part review of Tibbs' sentences of imprisonment. See *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. First we must determine whether the sentences were contrary to law. See id. at ¶14. Then, if the sentences were not contrary to law, we must review each to determine whether the trial court abused its discretion in imposing them. See id. at ¶17.

{¶52} Here, the sentences imposed were not contrary to law. Tibbs concedes that the sentences were within the ranges provided by statute for aggravated murder, a special felony, for aggravated robbery, a first-degree felony, and for the three-year firearm specification. See R.C. 2929.03(A) and 2929.14(A)(1); see, also, *State v. Phelps*, 1st Dist. No. C-100096, 2011-Ohio-3144, ¶40. In light of the seriousness of the offense, the killing of another human being during a drug-related robbery, we cannot say that the trial court

abused its discretion in imposing sentence. See *State v. Kalish* at ¶17. The fourth assignment of error is overruled.

**{¶53}** Therefore, the judgment of the trial court is affirmed.

Judgment affirmed.

**DINKELACKER, P.J.,** and **HILDEBRANDT, J.,** concur.

Please Note:

The court has recorded its own entry on the date of the release of this opinion.