[Cite as *State v. Diggle*, 2012-Ohio-1583.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 2-11-19

    v.

GORDON W. DIGGLE, III,             O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Auglaize County Common Pleas Court
Trial Court No. 2010-CR-174

Judgment Affirmed

Date of Decision: April 9, 2012

APPEARANCES:

    *Katherine A. Szudy* for Appellant

    *Edwin A. Pierce and Amy Otley Beckett* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Gordon W. Diggle, III ("Diggle"), appeals the Auglaize County Court of Common Pleas' judgment of conviction and sentence entered against him following a jury trial where Diggle was found guilty of one count of murder and one count of aggravated robbery. For the reasons that follow, we affirm.

{¶2} In February of 2010, Steven Casad ("Casad") was at home with his girlfriend, Brenda Fischer ("Fischer"), and two friends, Larry Thomas ("Thomas") and Diggle. (Trial Tr. at 351). Thomas and Diggle began fighting in Casad's kitchen. (*Id*. at 352). Casad called the police on the two men. (*Id*.). Diggle did not return to Casad's house in the months following the incident. (*Id*. at 358).

{¶3} On September 8, 2010, Casad went to happy hour at the Friendly Tavern around 3 p.m. (*Id*. at 325-328). Diggle arrived at the Friendly Tavern between 5 and 6 p.m. (*Id*. at 274). Diggle sat near Casad and Casad bought them each a couple of beers. (*Id*. at 288). After finishing the drinks, Casad and Diggle left the Friendly Tavern and went into the alley next to the building. (*Id*. at 281-282). While in the alley, Diggle beat Casad and robbed him of roughly $750, telling Casad, "call the cops now" during the beating. (*Id*. at 350); (Ex. H). Diggle then walked across the street from the Friendly Tavern, got in his car, and left. (Trial Tr. at 282).

{¶4} Casad, who lived about a block from the Friendly Tavern, returned home around 6 p.m. (*Id.* at 283, 328). Fischer could see Casad was bleeding from multiple injuries and called 911. (*Id.* at 332, 336). Emergency personnel arrived and transported Casad to the local hospital where the medical staff discovered Casad had an epidural hematoma, a traumatic brain injury. (*Id.* at 336, 724). Casad was then transferred by helicopter to a hospital near Dayton, Ohio, where he underwent a craniotomy. (*Id.* at 353, 768).

{¶5} Following the craniotomy, Casad was sedated to reduce the swelling in his brain. (*Id.* at 770). On September 12, 2010, Casad developed a pulmonary embolism as a result of his immobility. (*Id.* at 771-773). Casad died an hour and ten minutes after the pulmonary embolism was detected. (*Id.* at 797).

{¶6} The coroner determined that Casad died as a result of blunt force trauma to the head. (*Id.* at 847). During the trial, the coroner testified that the craniotomy and sedation were necessary to treat the blunt force trauma, and the pulmonary embolism was a result of the sedation. (*Id.* at 846-847). Consequently, the coroner determined that Casad's death was a homicide caused by a blunt force trauma. (*Id.* at 847).

{¶7} On December 22, 2010, Diggle was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(1), a felony of the second degree (count two); one count of aggravated robbery in violation of R.C. 2911.01(A)(3), a

felony of the first degree (count four); and two counts of murder in violation of 2903.02(B), felonies of the first degree (counts one and three). (Doc. No. 1).

{¶8} Diggle had a jury trial on April 18-21, 25, and 26, 2010. (Trial Tr. at 1). The jury found Diggle guilty on all four counts. (Doc. Nos. 145-148).

{¶9} The trial court held a sentencing hearing on July 20, 2011 and issued its judgment entry on July 22, 2011. (Doc. No. 209). The trial court determined that murder (count one) and felonious assault (count two) were allied offenses of similar import and should merge. (*Id*.). The trial court also determined that murder (count three) was pleaded as an alternative to murder (count one), so Diggle could not be sentenced on both counts. (*Id*.). Consequently, the trial court found that Diggle was convicted of murder (count one) and aggravated robbery (count four). (*Id*.). The trial court sentenced Diggle to a prison term of 15 years to life and a fine of $2,500 for his murder conviction (count one), and a consecutive prison term of 10 years for his aggravated robbery conviction (count four), for a total sentence of 25 years to life imprisonment and a $2,500 fine. (*Id*.).

{¶10} On August 22, 2011, Diggle filed a notice of appeal and now raises three assignments of error for our review.[1] (Doc. No. 225).

### ASSIGNMENT OF ERROR NO. I

**THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT IMPOSED SEPARATE SENTENCES FOR OFFENSES THAT**

---

[1] The end of the 30 day time period for filing a notice of appeal fell on Sunday, August 21, 2011. Under App.R. 14, Diggle was permitted to file his notice of appeal on Monday, August 22, 2011.

**AROSE FROM THE SAME CONDUCT, WERE NOT COMMITTED SEPARATELY OR WITH A SEPARATE ANIMUS, AND SHOULD HAVE BEEN MERGED FOR SENTENCING PURPOSES UNDER R.C. 2941.25 (JULY 22, 2011 JOURNAL ENTRY; SENTENCING T. PP 24-25)**

{¶11} In his first assignment of error, Diggle argues the trial court abused its discretion when it determined his murder and aggravated robbery convictions were not allied offenses of similar import. Diggle contends that the counts of murder and aggravated robbery were committed with the same conduct and the same animus. As a result, Diggle argues the trial court should have merged the two offenses.

{¶12} Whether offenses are allied offenses of similar import is a question of law that this Court reviews de novo. *State v. Stall*, 3d Dist. No. 3-10-12, 2011-Ohio-5733, ¶ 15, citing *State v. Brown*, 3d Dist. No. 1-10-31, 2011-Ohio-1461, ¶ 36.

{¶13} R.C. 2941.25, Ohio's multiple-count statute, states:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or

more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶14} In *State v. Johnson*, the Supreme Court of Ohio modified the analysis for determining whether offenses are allied offenses of similar import under R.C. 2941.25. 128 Ohio St.3d 153, 2010-Ohio-6314. First, the court must determine whether it is possible to commit both offenses with the same conduct. *Id*. at ¶ 48. "If the multiple offenses can be committed with the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., 'a single act, committed with a single state of mind.'" *Id*. at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J., dissenting). If it is possible to commit the offenses with the same conduct and the defendant did, in fact, commit the multiple offenses with the same conduct, then the offenses are allied offenses of similar import and will merge. *Id*. at ¶ 50. However, "if the court determines that the commission of one offense will *never* result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then according to R.C. 2941.25(B), the offenses will not merge." *Id*. at ¶ 51.

{¶15} In the present case, Diggle was convicted and sentenced for murder in violation of R.C. 2903.02(B), and aggravated robbery in violation of R.C. 2911.01(A)(3). (Doc. No. 209). R.C. 2903.02(B), the murder statute, states, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2911.01(A)(3), the relevant aggravated robbery statute, provides, "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (3) [i]nflict, or attempt to inflict, serious physical harm on another."

{¶16} In regards to the first prong of the *Johnson* test, it is possible to commit murder under R.C. 2903.02(B) and aggravated robbery under R.C. 2911.01(A)(3) with the same conduct. *State v. Irbey*, 6th Dist. No. L-10-1139, 2011-Ohio-2079, ¶ 21. Each offense requires an act of violence. R.C. 2911.01(A)(3); 2903.02. Thus, it is possible that the victim could die from the serious physical harm inflicted in the course of the aggravated robbery, resulting in the victim's murder. Since it is possible to commit the two offenses with the same conduct, this Court must examine Diggle's conduct in the present case to

determine whether he did commit the two offenses with the same conduct and the same animus. *Johnson* at ¶ 50-51.

**{¶17}** The evidence presented at trial demonstrated that Diggle had a separate animus for each offense. According to the trial testimony, Casad had previously reported Diggle to the police when Diggle began fighting in Casad's home. (Trial Tr. at 352). Diggle and Casad no longer spent time with one another following that episode as they had before. (*Id.* at 358). On the afternoon of the incident that resulted in this case, Diggle asked a mutual friend, Thomas, where he could find Casad. (*Id.* at 445). That same afternoon, Diggle went to the Friendly Tavern, a bar where Casad frequently attended happy hour. (*Id.* at 274). Diggle beat Casad in the alley next to the Friendly Tavern, telling Casad during the beating, "[c]all the cops now." (*Id.* at 350). Diggle also reached into Casad's pocket and took roughly $750. (*Id.*); (Ex. H). These facts show that Diggle had the intent to beat Casad as revenge for calling law enforcement on Diggle, which is a separate animus from his intent to steal his money. Since Diggle had a separate animus for the felonious assault that resulted in his murder conviction from his animus for the aggravated robbery, the murder and aggravated robbery offenses are not allied offenses of similar import. This conclusion is consistent with determinations made by other Ohio courts of appeals concluding that murder and aggravated robbery offenses can be committed with a separate animus, and

when this is the case, they are not allied offenses of similar import under *Johnson*. *State v. Tibbs*, 1st Dist. No. C-100378, 2011-Ohio-6716, ¶ 43-50 (Defendant had a separate animus in robbing and killing the victim); *Irbey* at ¶ 24-25 (Court found evidence that the defendant planned to murder the victim in addition to robbing him).

{¶18} Additionally, the extent of Casad's injuries provides further support for this Court's conclusion that the two offenses are not allied offenses of similar import. Casad's injuries included lacerations to his face, swelling to his face and arms, a hairline fracture in his orbit (eye socket), bruising and swelling in his brain, and an epidural hematoma (bleeding in the brain) requiring a craniotomy. (Trial Tr. at 718-725). These multiple, serious injuries show Diggle used greater force than necessary to complete the aggravated robbery. Thus, the extent of Casad's injuries are further evidence that Diggle had the animus to beat Casad as revenge for calling the police on him in addition to his animus to steal Casad's money. This conclusion is also consistent with other Ohio courts of appeals that have determined a defendant's excessive use of force is an indication of a separate animus. *State v. Ruby*, 6th Dist. No. S-10-028, 2011-Ohio-4864, ¶ 61 (Extent of beating demonstrated a separate animus for the attempted murder and theft offenses); *Tibbs* at ¶ 43 (Manner in which defendant killed the victim showed a separate intent for the murder from the aggravated robbery).

{¶19} Diggle's first assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. II**

**GORDON DIGGLE, III'S SIXTH AMENDENT RIGHT TO CONFRONTATION WAS VIOLATED WHEN THE STATE INTRODUCED TESTIMONIAL HEARSAY STATEMENTS FROM THE VICTIM-DECEDENT DURING MR. DIGGLE'S TRIAL. SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION; SECTION 10, ARTICLE I OF THE CONSTITUTION;** *CRAWFORD V. WASHINGTON* **(2004), 541 U.S. 36, 124 S.CT. 1354. (APRIL 16, 2011 JOURNAL ENTRY; VOLUME II, T. PP 376, 389-392, 413, 555-556, 602-603)**

{¶20} In his second assignment of error, Diggle argues that the trial court violated his Sixth Amendment rights by admitting Casad's testimonial hearsay statements. Specifically, Diggle points to the testimony of Officer Turpin, Captain Kramer, Nicholas Scott, Captain Sweigart, and Sergeant Eberle. Diggle contends that the statements Casad made to these men when they arrived at his house in response to Fischer's 911 call were testimonial in nature. Diggle argues that the admission of these statements during the trial was a violation of his right to confront the witnesses presented against him.

{¶21} The Confrontation Clause of the Sixth Amendment states, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." This Court reviews de novo the question of whether a defendant's constitutional rights under the Confrontation Clause have been

violated. *State v. Guiterrez*, 3d Dist. No. 5-10-14, 2011-Ohio-3126, ¶ 43, citing *State v. Smith*, 162 Ohio App.3d 208, 2005-Ohio-3579, ¶ 8 (8th Dist.).

**{¶22}** In *Crawford v. Washington*, the United States Supreme Court determined that "[w]here testimonial evidence is at issue * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. 36, 68, 241 S.Ct. 1354 (2004). The Court did not establish a comprehensive definition of "testimonial" but stated that at a minimum, it included prior sworn testimony and police interrogations. *Id.*

**{¶23}** The United States Supreme Court expanded on how courts should determine whether statements are testimonial in *Davis v. Washington*, stating:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. 547 U.S. 813, 822, 126 S.Ct. 2266 (2006).

**{¶24}** The United States Supreme Court addressed this issue most recently in *Michigan v. Bryant*, 131 S.Ct. 1143 (2011). The Court stated that the standard

rules of hearsay are also relevant in determining whether out of court statements are testimonial. *Id*. at 1155. A court must further "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties" to determine whether the primary purpose was to assist an ongoing emergency. *Id*. at 1156. As a result, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had." *Id*. The court should consider the primary purpose of both the declarant and the interrogator. *Id*. at 1160. This analysis prevents problems that could arise from mixed motives on the part of the declarant or the interrogator, and also considers that police officers often fulfill the dual responsibilities of first responders and criminal investigators. *Id*. at 1161. The court should also take into account that the parties' primary purpose can change over the course of the interrogation. *Id*. at 1159. In those instances, the trial court should exclude those portions of the statements that become testimonial. *Id*. at 1159-1160.

{¶25} Courts should look at all of the relevant circumstances when determining whether statements are testimonial. *Id*. at 1161. Specifically, courts should consider the medical condition of the victim and formality of the encounter between the declarant and police officer. *Id*. at 1159-1160. The Court explained, "[t]he medical condition of the victim is important to the primary purpose inquiry

to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Id.* at 1159. Additionally, the formality of the encounter is relevant because a formal interrogation suggests that the parties are no longer in an emergency situation, although courts should be aware that "informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id.* at 1160. If the circumstances indicate that the primary purpose of the statements is to address an ongoing emergency, then it is presumed that the statements will be reliable and do not require cross-examination pursuant to the Confrontation Clause. *Id.* at 1156.

{¶26} In the present case, Diggle contends that statements Casad made in the presence of Officer Turpin, Captain Kramer, Nicholas Scott, Captain Sweigart, and Sergeant Eberle were testimonial because their primary purpose was to investigate a crime, not to deal with an ongoing emergency. Officer Turpin, Captain Kramer, Nicholas Scott, and Captain Sweigart were the first responders who arrived at Casad's home in response to Fischer's 911 call. (Trial Tr. at 372, 387, 412, 554). Officer Turpin was the police officer first called to the scene, while Captain Kramer, Nicholas Scott, and Captain Sweigart were all paramedics who arrived at the same time as Officer Turpin. (*Id.*). Sergeant Eberle, another police officer, arrived shortly thereafter. (*Id.* at 556, 602).

{¶27} Captain Kramer testified that when the first responders arrived, Casad's "face was all bloodied, bruising and swelling, mostly on the left side, left eye was almost swelled shut, blood all over his face, his hands, several lacerations." (*Id*. at 373). Nicholas Scott testified that Casad was "covered in blood and had been what appeared to be assaulted" and that the paramedics began cleaning Casad to determine the extent of his injuries. (*Id.* at 388*).* Captain Kramer described Casad as "upset and worried." (*Id*. at 374). Nicholas Scott testified that while the paramedics began cleaning and treating Casad, Officer Turpin asked him what happened. (*Id*. at 405). Casad stated that he had been at the Friendly Tavern and was jumped in the alley, beaten, and robbed. (*Id*. at 406). Officer Turpin asked Casad if he knew who had beaten him. (*Id*.). Casad responded that it was Gordon Diggle. (*Id*.). Officer Turpin asked Casad if it was the same Gordon Diggle that drove a white Cadillac, and Casad told him it was. (*Id*.). During this exchange, the paramedics continued to clean Casad and evaluate the extent of his injuries. (*Id*. at 390). The paramedics then strapped Casad to their cot and loaded him into the ambulance. (*Id*.).

{¶28} At trial, Officer Turpin, Captain Kramer, Nicholas Scott, Captain Sweigart, and Sergeant Eberle all testified that Casad had been jumped, beaten, and robbed by Diggle based on Casad's statements. (*Id*. at 371-415, 553-608). Specifically, Officer Turpin testified that Casad told him "that he was jumped in

the alley by the Friendly by Gordon Diggle" and that Casad said "that while he was being jumped, Gordon Diggle reached into his pocket and took seven hundred and fifty dollars ($750.00) in cash from him." (*Id*. at 555-556). Captain Kramer testified that Casad "said he had been at the Friendly Tavern having a few beers because he gave us the name of the gentleman that did this to him and he said they had actually had a few beers. He had bought the beer." (*Id*. at 376). Captain Kramer testified that the "gentleman's" name was Gordon Diggle. (*Id*.). Nicholas Scott testified that Casad "said that he was at the Friendly Tavern and he said he got up to leave and was followed out into the alley and from there he was punched," referring to Diggle as the assailant. (*Id*. at 389-392). Captain Sweigart testified that as they started treating Casad, he said, "I know who did this to me" and identified Diggle. (*Id*. at 413). Sergeant Eberle testified that "Mr. Casad indicated that he had been assaulted or jumped when he left the Friendly Tavern" and that he said Gordon Diggle was who had assaulted him. (*Id*. at 608).

{¶29} The trial court determined that Casad's statements to the emergency personnel were not testimonial and were admissible pursuant to the hearsay exceptions in Evid.R. 803(1) (present sense impression), 803(2) (excited utterance), 803(4) (statements for purposes of medical diagnosis or treatment), and 804(A)(4)(B)(6) (forfeiture by wrongdoing). We agree with the trial court's

conclusion that Casad's statements were not testimonial and admissible as statements made for the purposes of medical diagnosis or treatment.

{¶30} Turning first to the question of whether Casad's statements were testimonial, the evidence presented at trial established that Officer Turpin arrived on the scene with the paramedics as the first responders to Fischer's emergency call. (*Id*. at 554) At the hearing on Diggle's motion in limine to exclude Casad's statements, Officer Turpin testified that when he arrived on the scene, he believed Casad may have been part of a bar fight and there could have been other injured individuals. (Motion Hearing Tr. at 63). At the trial, Officer Turpin further testified that when he began interviewing Casad his "principle objective was trying to figure out exactly what happened at that immediate time." (Trial Tr. at 566). He stated that he did not view the interaction as a criminal investigation while he was at Casad's house because he asked very few questions and mainly let the paramedics take care of Casad. (*Id*.). Officer Turpin testified that his interview of Casad did not become a criminal investigation until he had more details about what had occurred. (*Id*.). Officer Turpin's testimony is supported by an objective view of his questions to Casad, which were limited to asking what had occurred, who else was involved, and clarifying that Casad was referring to Diggle and not Diggle's father, who has the same name. (*Id*. at 405-406). The interview was very brief, taking place while the emergency personnel were evaluating the nature of

Casad's injuries and preparing to load him into the ambulance. (*Id.* at 413). Thus, the purpose of Officer Turpin's interview with Casad was to deal with an ongoing emergency by determining what had happened to Casad and who else had been involved, which enabled Officer Turpin to establish the potential danger to Casad, the public, and what steps were necessary to deal with the situation.

{¶31} Additionally, the formality of the encounter and Casad's medical condition are relevant in determining whether the statements were testimonial. *Michigan v. Bryant*, 131 S.Ct. 1143 at 1159-1160. The United States Supreme Court has concluded that the interview is formal when it occurs at the police station at some point after the event, or if the declarant calmly relates the facts to the officer at the scene of the event after the emergency has ended. *Id.* at 1153-1155; *Davis*, 547 U.S. 813. On the other side of the spectrum is the informal interview, which the Court has found includes when the declarant is on the phone with a 911 operator while the emergency is occurring. *Bryant* at 1159-1160*; Davis*. The present case falls on the informal side of the spectrum. The first responders arrived at Casad's home within minutes of Fischer's emergency call. (Trial Tr. at 394). Casad had been recently beaten and robbed, and was suffering from numerous serious injuries. (*Id.* at 373-376). The paramedics testified that Casad was "upset" and "worried." (*Id.* at 373-374, 389). Officer Turpin interviewed Casad at Casad's house while paramedics treated him and prepared

him for transport to the hospital, which occurred within the span of 10 to 15 minutes from the time the first responders arrived on the scene. (*Id.* at 372-375). Furthermore, Casad was suffering from an epidural hematoma (bleeding in the brain), swelling in his brain, a fractured orbit (eye socket), and numerous lacerations. (*Id.* at 718-725). The extent and nature of Casad's injuries provides additional support for the conclusion that the primary purpose of Casad's statements was to assist Officer Turpin in addressing the ongoing emergency.

{¶32} Finally, the issue of whether the statements are admissible under a hearsay exception is relevant, but not dispositive, to this Court's determination of whether the statements were testimonial. *Bryant* at 1155. Captain Kramer testified that he did not remember what he said on the scene to Casad, but it would be common for him to ask him general questions such as the time of day or if he remembered what had happened. (*Id.* at 378-379). Captain Kramer testified that the purpose of these questions is to determine "a level of consciousness to see if they are alert." (*Id.* at 379). The testimony at trial implied that Officer Turpin, not Captain Kramer, questioned Casad regarding what had occurred. (*Id.* at 405-406). However, Casad's ability to recall what had happened to him was relevant to the paramedics' ability to determine Casad's level of consciousness regardless of which first responder began the interview. Thus, these statements were made for the purpose of medical treatment and were thus admissible under Evid.R. 803(4).

Since the primary purpose of the statements was to address an ongoing emergency and provide the paramedics with information to treat his injuries, Casad's statements were not testimonial and therefore were admissible.

{¶33} Even assuming *arguendo* that the statements were testimonial, their admission would be harmless error in light of the remaining evidence. "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824 (1967).

{¶34} The cumulative evidence, which Diggle does not contest in the present appeal, demonstrates that any error in admitting the first responders' testimony is harmless beyond a reasonable doubt. Numerous other witnesses provided the same information as the first responders. At trial, Fischer testified that after he returned to the house, Casad stated that he had been beaten and robbed by Diggle, and that Diggle stole $800. (Trial Tr. at 350). According to Fischer, Diggle told Casad, "call the cops now," while Diggle was beating Casad. (*Id.* at 333-350.) Gary Cathcart, a physician's assistant at the Joint Township emergency department, testified that

> the patient reported to me he was assaulted approximately ten minutes before calling EMS. He was jumped from behind by what he describes as a friend at the Tavern. States he was sucker punched

-19-

and he reports that the person that attacked him had an altercation at his house earlier with another man. He called the police to get them out of the house and keep them from breaking up his house. (*Id*. at 717).

Brenda Warniment, a nurse at the Joint Township emergency department, testified that during her neuro assessment of Casad, he told her that he was kicked, punched, and beat by Diggle. (*Id*. at 693-694). Brenda Warniment further testified that Casad stated that he had been assaulted because he had previously called the police on Diggle. (*Id*. at 694-695). Erica Zimpher, a flight nurse that did Casad's critical care transport, testified that Casad stated that he "had been stomped in the head by a guy with steel toe boots." (*Id*. at 730). Thus, Casad consistently stated that Diggle had robbed and beaten him because Casad had previously called the police on Diggle.

{¶35} Diggle's own actions provide further evidence. Brenda Chaney, the bartender at the Friendly Tavern, testified that Diggle left with Casad, appeared to go into the alley with Casad, and then Diggle walked across the street to his car a few minutes later. (*Id*. at 282). Shortly thereafter, Brenda Chaney observed an ambulance pull up to Casad's house. (*Id*. at 282-283). Thomas, a mutual friend, testified that he went to breakfast with Diggle the morning of the incident. (*Id*. at 443). At that time, Diggle had roughly $100. (*Id*.). Thomas received a phone call

from Diggle the day after the incident, and Thomas told Diggle he needed to turn himself in. (*Id*. at 447-448). Diggle told Thomas, "What? I didn't do nothing. Steve Casad went in the alley and I took off." (*Id*. at 448). Diggle then threatened to beat Thomas if he went to the police. (*Id*.). Doug Adams, a friend of Diggle's, testified that Diggle showed up at his house unannounced between 6 and 6:30 p.m. the day of the incident and that Diggle had a large amount of money with him. (*Id*. at 424). Randy Simpson worked at a concession wagon with Diggle in the days following the incident and testified that Diggle had a large amount of money when they left to work for the weekend. (*Id*. at 677-680). Randy Simpson further testified that Diggle told him that "the law was looking for his brother for something that happened in a bar with somebody getting beat up and robbed." (*Id*. at 681). Finally, Loretta Avila, Diggle's aunt, testified that she saw Diggle after the incident and told Diggle "that guy died." (*Id*. at 889). In response, Diggle said, "no way." (*Id*.).

{¶36} In addition to Casad's numerous, consistent statements, Diggle's own actions thus establish that he was near the Friendly Tavern at the time that Casad was beaten and left shortly before Casad arrived home seriously injured. Diggle also had a substantially smaller amount of money the morning of the incident than in the evening and days following the incident. Finally, Diggle made incriminating statements to his co-worker, his aunt, and threatened a friend.

{¶37} This Court finds that the first responders' statements were admissible because their primary purpose was to address an ongoing emergency. However, if there was any error in admitting the statements of the first responders, this Court concludes that it was harmless beyond a reasonable doubt due to the cumulative effect of the evidence.

{¶38} Diggle's second assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. III

**TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I (VOLUME II, T. PP. 340-344, 575-591, 597-599; APRIL 16, 2011 JOURNAL ENTRY)**

{¶39} In his third assignment of error, Diggle argues his trial counsel was ineffective. Diggle contends that his trial counsel did not understand the trial court's ruling on Diggle's motion in limine, and committed prejudicial error by admitting statements that had been excluded.

{¶40} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Bradley*, 42 Ohio St.3d 136, 142 (1989), citing *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley* at 142; *Strickland* at 694.

**{¶41}** In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 687. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *Bradley* at 141-142, citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

**{¶42}** According to *Strickland*, we must first determine whether counsel's performance was deficient or unreasonable under the circumstances. *Id*. at 687. At issue, in his motion in limine, is testimony Diggle contended was inadmissible. (Doc No. 84). The trial court granted Diggle's motion in regards to statements Casad made to Officer Turpin while Casad was at the Joint Township emergency

department. (Doc. No. 109). These statements included Casad's assertion to Officer Turpin that Diggle stated "I'll teach you to call the cops on me again," while he was beating Casad. (*Id*.); (Ex. H).

{¶43} During his cross examination of Officer Turpin, counsel questioned Officer Turpin at length regarding the scope of his investigation. (Trial Tr. at 572-578). The purpose of this line of questioning was to impeach Officer Turpin's credibility regarding the extent of the investigation and demonstrate for the jury that the police focused their investigation solely on Diggle and failed to consider other suspects. (*Id*.). During defense counsel's cross examination, the State objected, stating "[t]his witness is already instructed not to answer that question pursuant to the Motion in Limine." (*Id*. at 587). The following exchange then occurred:

> **Trial Court:** Okay. But if the door's opened, the door's open. He (defense counsel) opened the door. * * * He's opened the door by asking what all this officer contemplated and so forth. So if he's opened the door, he's opened the door.
>
> **Defense Counsel:** I just want to make sure there's no misunderstanding. The Motion in Limine does not take and stop me from doing anything.

**Trial Court:** That's right and if you open the door, you open the door.

**Defense Counsel:** And the door's been opened because the Court has said that all this testimony is admissible.

**Trial Court:** No, that's not true. The Court limited certain testimony. Now you've opened the door to it. But he'll answer the questions. I'll instruct him to answer the questions. (*Id*. at 587-588).

This exchange between the trial court and defense counsel indicates that although defense counsel had a tactical purpose for questioning Officer Turpin about his investigation, defense counsel may not have realized the question was opening the door to evidence that had been excluded under the motion in limine. (*Id*.). Consequently, this Court must now consider whether Diggle was prejudiced by the resulting testimony.

{¶44} After the trial court ruled defense counsel had opened the door to previously excluded testimony, Officer Turpin testified on cross examination that Casad had told him that Diggle stated, "I'll teach you not to call the cops on me again." (*Id*. at 591). The trial court also admitted Officer Turpin's report, which stated:

Mr. Casad said that he had gone into the Friendly Tavern and had been drinking with Gordon Diggle. He said it was just those two

and the barmaid and that he had purchased a drink or two for Diggle. Casad says he always carries a large quantity of cash that he rolls up in his pocket and estimated it to be $700 to $750. He says that as he walked out of the Friendly Tavern and started to walk through the alley, he was assaulted and beaten by Gordon Diggle who then reached in his pocket, stole his money. Casad said that he thought that Diggle was going to kill him. He said that Diggle's [sic] walked across the street and left in his white Cadillac. (Ex. H).

{¶45} We cannot find that this admitted evidence prejudiced Diggle. Throughout the trial, other witnesses testified to the same facts. Thus, the evidence was cumulative and did not result in prejudice to Diggle. Consequently, we cannot find that there is a reasonable probability that the outcome of the trial would have been different absent this evidence.

{¶46} Diggle's third assignment of error is, therefore, overruled.

{¶47} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J. concurs.**

**ROGERS, J. concurs; and concurs in Judgment Only as to Assignment of Error No. II.**

**/jlr**