[Cite as *State v. Jackson*, 2012-Ohio-2335.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

     Plaintiff-Appellee                       :          C.A. CASE NO.    24430

v.                                               :          T.C. NO.    10CR1126

DENNIS D. JACKSON                                :          (Criminal appeal from
                                                            Common Pleas Court)

     Defendant-Appellant                      :

                                                 :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ____25th____ day of _____May_____, 2012.

· · · · · · · · · ·

ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

JAMES S. ARMSTRONG, Atty. Reg. No. 0020638, 131 North Ludlow Street, Suite 386 Talbott Tower, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, J.

     **{¶ 1}**  Dennis Devone Jackson was found guilty by a jury of three counts of

murder, two counts of aggravated burglary, two counts of aggravated robbery, and two counts of felonious assault, each with a firearm specification. The trial court merged several counts, and Jackson was sentenced to an aggregate term of twenty-eight years to life in prison. Jackson appeals from his conviction, raising numerous assignments of error. For the following reasons, we will affirm the judgment of the trial court.

{¶ 2} On the night of March 19, 2010, someone entered Unit 4716 in the Deer Creek apartment complex, shot Antoine West, and robbed him. Two other people who were in the apartment at the time, Thomas Horn and Kimberly Carl, were unharmed. Carl was unable to identify the shooter, and Horn later gave conflicting statements about whether he could identify the shooter.

{¶ 3} An investigation by the Trotwood Police Department led the detectives to believe that Jackson had been the assailant, that Jackson shot West with a gun Jackson had borrowed from an acquaintance, Dion Sims, and that Jackson had taken a large sum of money from West.

{¶ 4} Jackson was indicted on the following offenses: murder (as a proximate result of aggravated burglary); aggravated burglary (deadly weapon); murder (as a proximate result of aggravated robbery); aggravated robbery (deadly weapon); murder (as a proximate result of a felonious assault); felonious assault (deadly weapon); felonious assault (serious harm); aggravated burglary (physical harm); and aggravated robbery (serious harm). The indictment also contained a firearm specification on each count.

{¶ 5} Before trial, Jackson filed a motion to suppress photo identification evidence and statements he made to the police during the investigation. After a hearing, his

motion to suppress was overruled.

{¶ 6}    The case was set for trial on August 30, 2010.   On that date, however, the State informed the court that it had been unable to locate Horn, who was a key witness.   The State requested a continuance and asked the court to issue a material witness warrant for Horn.   The trial court granted the State's request for a continuance, issued a material witness warrant for Horn, and reset the trial for three weeks later.

{¶ 7}    The first trial began on September 20, 2010.   At that time, the State still had not located Horn.   Jackson requested a mistrial, however, when one of the State's witnesses, Dion Sims – who, in Jackson's estimation, was an alternate suspect – revealed during his testimony that he had taken a lie detector test. Jackson's motion for a mistrial was granted.

{¶ 8}    Thereafter, Jackson argued to the court that his right not to be placed in double jeopardy and his right to a speedy trial had been violated, and he asked that the charges against him be dismissed.   The trial court overruled the motion to dismiss, and a second trial was scheduled for December 2010.   Meanwhile, Thomas Horn was located in October 2010 and was arrested pursuant to the material witness warrant.   Horn's deposition was taken, in accordance with Crim.R. 15, before he was released from custody; he was also served with a subpoena for trial before he was released.

{¶ 9}    Jackson's second trial was held on December 3 and December 6-10, 2010. Horn did not appear at trial and could not be located by the police. The trial court declared Horn unavailable, and his deposition was played for the jury.    In his deposition testimony, Horn claimed not to recall the identity of the shooter, but he admitted and was

cross-examined by the State about prior statements in which he identified Jackson as the shooter.

{¶ 10}   The State also presented evidence at trial that Sims had loaned a gun to Jackson on the day of the shooting and that forensic evidence linked that gun to the shooting. The State offered testimony from a neighbor of the victim that a man running from the building after the shooting had worn a multi-colored jacket, testimony and surveillance video showing that Jackson had worn a similar jacket earlier in the day, and testimony that the victim had been in possession of a large sum of cash at the time of the shooting. No cash was found on the victim's body, and his pants' pockets had been turned inside out. The State also offered evidence to discredit Jackson's statements to the police about where he had been at the time of the shooting, including cell phone records and testimony from the people with whom he claimed to have been.

{¶ 11}   The defense did not call any witnesses.

{¶ 12}   The jury found Jackson guilty on all counts.

{¶ 13}   The trial court merged the counts of murder and felonious assault into one count of murder, and sentenced Jackson to fifteen years to life for that offense. The trial court also merged the two counts of aggravated burglary and the two counts of aggravated robbery; the court sentenced Jackson to ten years for aggravated burglary and ten years for aggravated robbery, to be served concurrently to one another, but consecutively to the sentence for murder. All of the firearm specifications were also merged, and Jackson was sentenced to three additional years of actual incarceration on the firearm specification.

{¶ 14}   Jackson raises eleven assignments of error on appeal. We will address

these assignments in an order that facilitates our discussion. We begin with the second and seventh assignments of error, which are related.

> THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO DISMISS ON THE GROUNDS OF DOUBLE JEOPARDY, AFTER THE FIRST TRIAL ENDED IN A MISTRIAL.

> THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO DISMISS ON THE GROUND OF SPEEDY TRIAL VIOLATION AFTER APPELLANT'S FIRST TRIAL ENDED IN MISTRIAL.

{¶ 15}   Jackson contends that he should not have been retried after the mistrial and that the charges against him should have been dismissed, because his right not to be placed in double jeopardy and his right to a speedy trial were violated by his retrial.

{¶ 16}   As discussed above, the case was originally set for trial on August 30, 2010. At that time, the State informed the court that it had been unable to locate one of its key witnesses, Thomas Horn, who was present at the time of the shooting. The State asked the court to continue the trial date and to issue a material witness warrant for Horn. The court inquired of the prosecutor how the State would proceed if Horn were not located, and the State indicated that it would proceed without him.[1] The court granted the motion for a continuance and issued a material witness warrant the same day. The trial was rescheduled for September 20, 2010.

{¶ 17}   Jackson had not waived his right to a speedy trial. According to Jackson's

---

[1] The record does not include a transcript of the court proceedings on August 30, 2010, which resulted in the continuance. However, these facts are not in dispute.

motion to dismiss, "the speedy trial time for commencing the trial * * * ended the week of September 20, 2010." Our own calculations support this assertion.

{¶ 18} A second jury trial began on September 20, 2010. The fifth witness called by the State was Dion Sims, the registered owner of the gun used in the shooting. (The defense viewed Sims as a potential suspect in the shooting.)

{¶ 19} Sims testified that Jackson had asked to borrow Sims's gun at 9:00 or 9:30 p.m. on March 19, 2010. Sims agreed to loan the gun to Jackson, and the men met at Sims's house shortly after 10:00 p.m. Sims gave Jackson the gun at that time.

{¶ 20} Sims further testified that, in the early morning hours of March 20, 2010, he received a phone call from a friend that caused him to be "a little worried, a little scared" that he might be "blamed for something [he] didn't do" at the Deer Creek apartment complex. Sims drove to the vicinity of the apartment complex twice during the early morning hours of March 20 to "see if anything had happened" and to "see if [he] could find [his] gun," but he was deterred from these tasks when he saw "[a] lot of police" there. Sims testified that Jackson never returned the gun.

{¶ 21} Sims further testified that, at a family gathering on March 20, he learned that his gun had been used in a shooting; in response to receiving this information, Sims "left [his] house and went to a hotel" and contacted an attorney. Sims's testimony on direct examination continued:

Q:      * * * At what point did you contact an attorney?

A:      It was either Sunday night or Monday morning. I think Monday

        morning. * * *

Q:      Okay. And who was that attorney that you contacted?

A:      Cynthia Thompson.

* * *

Q:      Okay. And how did you have that name?

A:      It's my cousin.

Q:      * * * And what was the reason that you chose to contact an attorney rather than contacting the police?

A:      Because if my gun was used, I didn't want to go talk to the police by myself.

Q:      Why not?

A:      It was my gun and if they had it, they would have tried to say I did it.

Q:      Okay. And did you ask your attorney or do you know whether your attorney contacted the police on your behalf?

A:      I believe she did and set up an appointment.

Q:      She set up an appointment?

A:      Yes.

Q:      Okay. Now, at some point, did you switch attorneys?

A:      Yes.

Q:      Okay. And why did you do that?

A:      Because I had taken a lie detector test.

DEFENSE COUNSEL:       Objection.

COURT:                  Sustained.

DEFENSE COUNSEL:     Can we approach the bench?

COURT:                          Yes, yes.

(At sidebar)

DEFENSE COUNSEL:     Judge, I'm moving for a mistrial right now.  I mean it's pretty darn obvious that the only way he would get his story to be believed is to say, "I took a lie detector test."  The Jury is going to believe he passed it.  And, you know, there's no way – I can't cross-examine him on that.

PROSECUTOR:     Judge, I do want the record to be clear that I have met with this witness.  We have gone over that we can't talk about that.  And I have even –

COURT:                 Oh, I'm not blaming. No, I –

PROSECUTOR:      I just want the record to be clear that I in no way intended to elicit that information.

DEFENSE COUNSEL:     Well, he just couldn't resist, I guess, but he did it and it was voluntary.

COURT:     Yeah, I think it – I mean, well, I'm going to send the Jury back to the Jury room for a moment and I'm going to think about this for a few minutes, but this seems pretty serious to me, this is not good.

{¶ 22}     The trial court declared a mistrial the next day, concluding that Sims's "credibility [was] certainly going to be a key issue for the jury to decide" and that no curative instruction "would be sufficient to undo that unfair and prejudicial taint" caused by

Sims's reference to having taken a lie detector test and the jurors' likely assumption that he had passed it.

{¶ 23}    Jackson filed a motion to dismiss with prejudice.  He argued that the mistrial was caused by prosecutorial misconduct.  He also argued that the State was "the fortuitous beneficiary of its own actions," because the trial had begun as the speedy trial time expired, the State had gone to trial without locating its material witness, and an "acquittal at trial [was] an inevitable result."  Jackson claimed that, through "prosecutorial impropriety" and "overreaching," the State had "'poison[ed] the well' against Jackson" while improving its own situation regarding the missing witness and the time within which it needed to bring Jackson to trial.

{¶ 24}    The State opposed the motion to dismiss, arguing that Sims's comment about the lie detector test "was not induced by the State and was in no way responsive to the question that was asked of him."  The State also pointed out that, during pretrial conferences, the State informed the court and defense counsel that it had cautioned Sims not to mention the polygraph and that Sims had not indicated "any refusal to comply with that request."

{¶ 25}    The trial court overruled the motion to dismiss.  It found no prosecutorial misconduct, and therefore no double jeopardy, and no violation of Jackson's right to a speedy trial.

{¶ 26}    We review the denial of a motion to dismiss on double jeopardy grounds or on speedy trial grounds for an abuse of discretion.  *United States v. Jorn*, 400 U.S. 470, 486, 91 S.Ct. 547, 267 L.Ed.2d 543 (1974); *State v. Cassell*, 2d Dist. Clark No. 09CA0064,

2011-Ohio-23, ¶ 12; *State v. Ross*, 9th Dist Summit No. 20980, 2002-Ohio-7317, ¶ 25.

{¶ 27} "'The double jeopardy clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, protects a criminal defendant from repeated prosecutions for the same offense.' *State v. Draughon*, 10th Dist. Franklin No. 97APA11-1536 (Sept. 1, 1998), citation omitted. 'When a trial court grants a criminal defendant's request for a mistrial, the double jeopardy clause does not bar a retrial.' *Id*. 'A narrow exception lies where the request for a mistrial is precipitated by prosecutorial misconduct that was intentionally calculated to cause or invite a mistrial.' *Id.*, citing *State v. Doherty*, 20 Ohio App.3d 275, 485 N.E.2d 783 (1st Dist.1984). 'Only where the prosecutorial conduct in question is intended to "goad" the defendant into moving for a mistrial may the defendant raise the bar of double jeopardy to a second trial after having succeeded in ending the first on his own motion.' *Id.*, citation omitted."
*State v. Simons*, 2d Dist. Champaign No. 99CA5, 2000 WL 1726904, * 6 (Nov. 22, 2000).

{¶ 28} With respect to prosecutorial misconduct, the trial court concluded that none of the prosecutor's conduct prior to Sims's statement about the lie detector test "would establish, even remotely * * * any prosecutorial misconduct" and that the comment was "not even remotely responsive to the question that had been posed." The court also observed that Sims chose to mention the polygraph test notwithstanding the prosecutor's instructions to Sims that he should not do so. Although the court acknowledged that the course of events resulting in a mistrial arguably benefitted the State,[2] the court found "absolutely no

---

[2] Horn had been arrested pursuant to the material witness warrant on October 8, 2010, before the second trial began, and his deposition was taken before he was released from custody.

prosecutorial misconduct" and no basis to conclude that the State had intentionally caused a mistrial. The court overruled the motion to dismiss on double jeopardy grounds.

{¶ 29} The trial court reasonably concluded that no prosecutorial misconduct was involved in Sims's disclosure at trial that he had taken a lie detector test. In the absence of prosecutorial misconduct, double jeopardy did not bar Jackson's retrial, and the trial court properly overruled his motion to dismiss on double jeopardy grounds.

{¶ 30} The trial court also overruled Jackson's motion to dismiss on speedy trial grounds. R.C. 2945.71, which sets forth the time in which a trial must be held, "does not include any reference whatever to retrials" or mistrials and, therefore, the standard to be applied "is basically reasonableness under the federal and state constitutions." *State v. Fanning*, 1 Ohio St.3d 19, 21, 437 N.E.2d 583 (1982). The holding in *Fanning* "is in accord with the view that the requirements of R.C. 2945.71, et seq. apply only until trial on the charges involved is commenced, and that when the trial terminates in a mistrial the second trial is but a continuation of the same trial proceeding. Therefore, and even though charges remain pending in the interval between the two phases of the same trial proceedings, that interval does not count against a defendant's statutory speedy trial time, so long as the period of time is reasonable." *State v. Morris*, 2d Dist. Montgomery No. 19283, 2003-Ohio-1049, ¶ 17, citing *State v. Roughton*, 132 Ohio App.3d 268, 724 N.E.2d 1193 (6th Dist.1999). Whether the period is reasonable is determined based on the circumstances of the case, including the length of the delay, the reason for the delay, the defendant's assertion of his right to a speedy trial, and prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

**{¶ 31}** In this case, the trial court correctly observed that Jackson's trial had begun within the time required for a speedy trial, i.e, within 90 days from his arrest, because he was incarcerated. The court also noted that, after a mistrial was declared, the State was allowed "a reasonable time" to bring the defendant to trial again.

**{¶ 32}** The mistrial was declared on September 23, 2010. Jackson filed a motion to dismiss on October 8, 2010, and the court overruled the motion on November 10, 2010. The second trial began no later than December 3, 2010.[3] The court concluded that the schedule in this case "was certainly well within any reasonable period to retry [Jackson]." We agree that this delay was reasonable under the circumstances, and the record does not suggest that the State protracted the delay in hopes of finding its witness or for any other improper purpose. The trial court did not abuse its discretion in overruling Jackson's motion to dismiss on speedy trial grounds.

**{¶ 33}** Jackson's second and seventh assignments of error are overruled.

**{¶ 34}** Jackson's first assignment of error states:

THE TRIAL COURT ERRED IN OVERRULING THE MOTION TO SUPPRESS THE PHOTO-SPREAD IDENTIFICATION BY THOMAS HORN AS SAID IDENTIFICATION WAS UNDULY SUGGESTIVE AND UNRELIABLE.

**{¶ 35}** Jackson claims that the trial court erred in admitting evidence that, using photo arrays presented by Trotwood detectives, Thomas Horn had identified Jackson as the

---

[3] On the afternoon of December 3, 2010, a jury view was conducted and the court gave preliminary instructions to the jury. These are the first transcribed proceedings from the second trial; voir dire of the jury was not transcribed. We infer that the jury was selected and sworn on the morning of December 3.

shooter and Dion Sims had identified Jackson as the person to whom Sims loaned the murder weapon. Jackson claims that the detective who presented the photo arrays to these witnesses had indicated that a suspect was part of each photo array, which rendered the identification procedure unduly suggestive.

{¶ 36} "Due process requires suppression of pre-trial identification of a suspect only if the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification." *State v. Marshall*, 2d Dist. Montgomery No. 19920, 2004-Ohio-778, ¶ 11, citing *Neil v. Biggers*, 409 U.S. 188, 196-97, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). "To warrant the suppression of identification testimony, the accused bears the burden of showing that the identification procedure was 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification' and that the identification itself was unreliable under the totality of the circumstances." *State v. Poindexter*, 2d Dist. Montgomery No. 21036, 2007-Ohio-3461, ¶ 11, citing *Manson v. Braithwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Biggers*; *State v. Broom*, 40 Ohio St.3d 277, 284, 533 N.E.2d 682 (1988). When the trial court's ruling on a motion to suppress is supported by competent, credible evidence, an appellate court may not disturb that ruling. *Poindexter* at ¶ 10, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994).

{¶ 37} At the suppression hearing, Detective Michael Pigman of the Trotwood Police Department, who was the lead detective in West's murder, testified for the State. Pigman testified that, after Jackson became a suspect in the case, Pigman used a computer program to assemble a photo array that included pictures of Jackson and five other

individuals with similar physical characteristics, who were chosen at random. Pigman created multiple versions, such that Jackson's picture was not in the same position on each array. He then showed one photo array to each of the three witnesses connected with the crime: Thomas Horn, Dion Sims, and Kimberly Carl.

{¶ 38} Pigman testified that, before showing the photo array to each witness, he read the photo array identification instructions while the pictures were covered and informed each witness that the spread "may or may not contain a picture of the person who committed the crime" being investigated. Pigman testified that he did not do anything to suggest that a suspect was depicted in the array.

{¶ 39} According to Pigman, Sims and Horn each identified Jackson from the photo array presented to him; Horn said that Jackson was the man involved in the shooting, and Sims stated that Jackson was the man to whom he had loaned his gun the night of March 19, 2010. (The three men knew one another prior to the shooting through their families.) Carl was not able to identify anyone in the photo array.

{¶ 40} Sims and Horn also testified at the suppression hearing. Sims's testimony corroborated Pigman's testimony that Sims had been instructed about the identification procedure before he was shown the photos and that Pigman had not indicated that a suspect was contained in the array or which person was the suspect.

{¶ 41} Horn similarly testified that Pigman had not made any statements to him prior to showing him the photo array which pressured him to make an identification or told him whom to pick. Horn admitted that he had known Jackson before the shooting, but had not initially identified Jackson to Detective Pigman as the shooter because he (Horn) was

scared.

**{¶ 42}** Jackson did not call any witnesses at the suppression hearing.

**{¶ 43}** The trial court found the testimony of Pigman, Sims, and Horn "credible and believable" with respect to whether the witnesses were properly instructed about the photographic line-up; it also found that they had not been told that a suspect was included in the photo array. The court concluded that the photo arrays shown to Sims and Horn (which depicted Jackson in different positions) did not make Jackson's photo stand out and were not otherwise suggestive. The trial court refused to suppress the testimony or exhibits related to the photographic line-up.

**{¶ 44}** The trial court reasonably concluded that Detective Pigman's manner of conducting the photo identifications was not improper, unduly suggestive, or likely to give rise to irreparable misidentification. Accordingly, we will not disturb the trial court's refusal to suppress these identifications.

**{¶ 45}** The first assignment of error is overruled.

**{¶ 46}** Jackson's third assignment of error states:

THE TRIAL COURT ERRED IN ADMITTING THE DEPOSITION TESTIMONY OF THOMAS HORN.

**{¶ 47}** Jackson claims that the State failed to make reasonable efforts to secure Horn's appearance at trial, and thus should not have been permitted to use his deposition testimony. Jackson further asserts that Horn's testimony "was crucial to the conviction, without which the result would have been different."

**{¶ 48}** The United States Supreme Court has held that testimonial, out-of-court

statements are barred under the Confrontation Clause unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the trial court. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Evid.R. 804(A), which addresses exceptions to the hearsay rule, defines unavailability as follows: "'Unavailability as a witness' includes any * * * situations in which the declarant: * * * (5) is absent from the hearing and the proponent of the declarant's statement has been unable to procure the declarant's attendance * * * by process or other reasonable means."

{¶ 49} Evid.R. 804(B)(1) provides that, if the declarant is unavailable as a witness, the following are not excluded by the hearsay rule: "*Former testimony*. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered * * * had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination. * * *"

{¶ 50} In criminal cases, the State bears the burden to produce the declarant regarding hearsay made at a prior judicial hearing, or to establish that the declarant is unavailable to testify; the State must satisfy this burden in order to utilize hearsay made at the prior judicial proceeding. *State v. Smith*, 2d Dist. Montgomery No. 22926, 2010-Ohio-745, ¶ 10, citing *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The Confrontation Clause of the Sixth Amendment and Evid.R. 804(B)(1) normally require a showing by the State that the hearsay declarant is unavailable despite reasonable efforts made in good faith to secure his presence for trial. *Id.* at ¶ 11, citing *State*

*v. Keairns*, 9 Ohio St.3d 228, 460 N.E.2d 245 (1984). A showing of unavailability must be based on testimony of witnesses rather than hearsay; mere statements that a search has been made lack sufficient particularity to allow the court to determine what steps have been taken and whether they were reasonable. *Id.* at ¶ 11, ¶ 13.

{¶ 51} Decisions regarding the admissibility of evidence at trial are within the broad discretion of the trial court and will be upheld absent an abuse of discretion and material prejudice. *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50; *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 43.

{¶ 52} On December 8, 2010, the trial court conducted a hearing on Horn's alleged unavailability to determine whether his deposition testimony could be presented to the jury. Detective Pigman testified at the hearing that, at the end of Horn's deposition on October 22, 2010, Horn had been served with a subpoena to appear for trial on December 3 and the week of December 6.[4] At that time, Horn was asked where he lived, and he gave an address on Northford Road. Pigman admitted that Horn had used this address in the past, and that Pigman "knew it was not a correct address, because he gives that address all the time and * * * he's never resided there, to my knowledge." However, Pigman stated that he (Pigman) "couldn't verify at that time when he [Horn] said he was living there whether or not he was going to be moving there."

{¶ 53} Pigman further stated that, when Horn failed to appear on December 3, a warrant was issued for his arrest so that any officer who "came in contact with him * * *

---

[4] Horn's service occurred approximately three weeks prior to the service of the other witnesses who were subpoenaed for trial.

would know that he was wanted." Pigman drove by the Northford address on December 3 looking for Horn, but the house was dark and no cars were there. After Horn failed to appear at trial, Pigman placed five or six calls to a phone number that had been given to him by Horn in an attempt to locate Horn, including calls on the day of the availability hearing. The calls were answered by voice mail by a man who identified himself as "Tom Tom,"[5] and Pigman testified that he recognized the voice on the message as Horn's. Pigman left messages, but did not receive a return phone call from Horn. Pigman checked with Horn's probation officer to see if she had any different or additional contact information for Horn, but she did not. The probation officer had last seen Horn at a hearing on November 10, at which time he appeared voluntarily and expressed "concerns over his safety" regarding the upcoming court date in Jackson's trial. Pigman also visited a previous address of Horn on Stop Eight Road, but found new residents living there.

{¶ 54} Pigman further testified that, on the second day of trial, December 6, Trotwood Detective Troy Dexter went to the house on Northford looking for Horn and talked with an occupant of the house. The occupant stated that Horn had not been seen at the house in more than a month.[6]

{¶ 55} At the end of the hearing, the trial court concluded that Horn's deposition had been taken in accordance with Crim.R. 15, that Jackson, the attorneys, and the judge had been present at the deposition, and that Jackson's attorney "had the very same motive to

---

[5] Several witnesses testified that Horn was known as "Tom Tom."

[6] Although Pigman's testimony included some hearsay, Jackson did not object to it.

develop Mr. Horn's cross examination testimony during the deposition as he would have if Mr. Horn were available to testify live at this trial." The court also found that the State had made a good faith effort to secure Horn's appearance at trial and that Horn was "unavailable" within the meaning of Evid.R. 804(A)(5).

{¶ 56} The court acknowledged Detective Pigman's testimony that he had known, at the time of Horn's deposition, that the address Horn provided may not have been a "good address." However, the court concluded that Horn did have some recent contact with the Northford address, as evidenced by the statement by the occupant of that house that Horn had been absent for only a month and Horn's use of that address with his probation officer. The court also observed that the fear Horn expressed to his probation officer "may very well explain his absence at this trial."

{¶ 57} The State successfully served Horn with a subpoena and, when he failed to appear for trial, it employed various means to attempt to locate Horn. Moreover, Horn had repeatedly stated to his probation officer and to Detective Pigman that he was afraid to testify against Jackson, and there had been extended periods before trial when the State – although motivated by its own desire to build a strong case against Jackson – had been unable to locate Horn or to secure his cooperation. The trial court did not abuse its discretion in concluding that Horn was unavailable and that his deposition testimony was admissible at trial. Moreover, Jackson has not argued with any specificity how he was prejudiced by the use of Horn's deposition, as opposed to live testimony.

{¶ 58} With respect to Pigman's knowledge that the address provided by Horn at Horn's deposition was not a "good" address, Jackson argued at trial that, if Detective

Pigman had raised a question as to the accuracy of the address provided by Horn at his deposition, the court may not have released him. We note, however, that, Horn was in jail for two weeks in October 2010 on the material witness warrant before his deposition was taken and that Crim.R. 15(A) provides for the discharge of a witness after his deposition has been taken. The record does not indicate that defense counsel objected to Horn's release or requested a verification of the address. The trial court did not abuse its discretion in implicitly refusing to hold Pigman's knowledge of the potential unreliability of Horn's address against the State, or in not keeping Horn in custody until trial.

{¶ 59} Finally, Jackson argues that, in order to have Horn declared unavailable and to use his former testimony at trial in accordance with Evid.R. 804, the State was required to take reasonable steps *before trial began* to secure Horn's presence at trial. He relies on *Smith*, 2d Dist. Montgomery No. 22926, 2010-Ohio-745, which cites *Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, in support of this argument.

{¶ 60} In *Smith*, the complaining witness, Cassie Davis, testified under oath at the defendant's parole revocation hearing before the defendant's trial began; in that testimony, Davis recounted how the defendant had come into her apartment, demanded money at knife point, and held her young son while she left the apartment in an attempt to get money from her sister, who lived in another unit of the apartment building.

{¶ 61} Although she was served with a subpoena before trial, Davis told a detective and an investigator from the prosecutor's office the week before trial that she was unwilling to testify; she told the investigator that "the reason she was not going to come to court was she was pregnant and she was afraid 'it would create too much stress and she

might lose the baby.'" The investigator informed Davis that a warrant could be issued for her arrest, but she indicated that she would hide.

{¶ 62} When Davis did not appear to testify on the second day of trial, a hearing was conducted to determine whether she was unavailable to testify. The detective and the investigator testified about their conversations with Davis the previous week. The detective also indicated that he had gone to Davis's apartment when she failed to appear for trial, but no one answered the door. Davis's sister, who lived in the same building, told the detective that Davis was home but would not answer the door. The investigator also went to the apartment when Davis failed to appear, but no one answered.

{¶ 63} The trial court concluded that the State had made reasonable efforts to secure Davis's appearance and had proven her unavailability. The court also indicated that it would issue a material witness warrant. Davis's prior testimony was played at the trial over Smith's objection. In our opinion, we noted that "[t]he former testimony was presented to the jury before the material witness warrant was issued and before it could be determined whether [the material witness warrant] might bear fruit." *Id.* at ¶ 22. Smith was found guilty of the charges against him the next day.

{¶ 64} On appeal, we held that the State had "failed to demonstrate that it had exerted reasonable efforts to secure Cassie Davis's appearance for trial." *Id.* at ¶ 23. In particular, we noted that the State did not take any steps in response to Davis's statement that she would defy the subpoena, and the trial court permitted the use of her prior statement at trial "even before efforts to bring her to court under a material witness warrant had been attempted." *Id.*

**{¶ 65}** Although *Smith* refers to efforts made to secure the availability of a witness "prior to trial" (quoting the U.S. Supreme Court case of *Ohio v. Roberts*), we note that neither the trial court's decision nor our opinion in *Smith* focuses on the distinction between efforts taken prior to trial and efforts taken after the witness has failed to appear in determining whether the State's efforts were reasonable. In fact, *Smith* suggests that, upon the issuance of the material witness warrant (after trial was underway), the trial court should have waited a reasonable period of time to see if that measure "might bear fruit." Thus, *Smith* implicitly condones the use of additional measures (after the trial has begun) to secure a witness who has failed to appear, before a court concludes that a witness is unavailable.

**{¶ 66}** In this case, Horn had not expressly refused to testify (as in *Smith*), but his past actions and his expressed fear of testifying created concern about whether he would, in fact, appear at trial. The fact that Horn's subpoena required him to appear several days before the State actually intended to use his testimony may have reflected the fact that the State or the court anticipated the need for additional measures to get Horn to appear. Thus, when the court issued a material witness warrant for Horn on the first day of trial, the State had several days to attempt to execute the warrant before Horn's testimony was needed. Moreover, as a general proposition, any efforts taken after trial begins are to the defendant's benefit. Whether the efforts were made before and/or after the trial began is a factor the court can consider in weighing the reasonableness of the State's actions. Under the facts of this case, we find no abuse of discretion in the court's conclusion that the State made reasonable efforts to secure Horn's appearance at trial before he was declared unavailable.

**{¶ 67}** Jackson's third assignment of error is overruled.

**{¶ 68}** Jackson's eighth assignment of error states:

THE TRIAL COURT ERRED IN PERMITTING TESTIMONY ABOUT AND ADMITTING CINCINNATI BELL CELL PHONE RECORDS WHICH WERE NOT PROPERLY AUTHENTICATED.

**{¶ 69}** Jackson claims that his cell phone records, which were obtained from Cincinnati Bell and about which Cincinnati Bell employee Paula Papke testified at trial, were not properly authenticated and should not have been admitted. He claims that Papke's testimony did not establish that the records were business records that fell within the exception to the hearsay rule set forth at Evid.R. 803(6). The records were pertinent to the State's case because they established that Jackson's cell phone signals were transmitted by towers in the vicinity of Trotwood in the hours before and after the shooting; Jackson told detectives that he had been in Kettering with the mother of one of his children at that time.

**{¶ 70}** Jackson did not object on the basis that the Cincinnati Bell exhibits were not business records or were not properly authenticated. Accordingly, we review for plain error, i.e., error that clearly affected the outcome of the case.

**{¶ 71}** In Ohio, a business record is admissible as competent evidence "if the custodian or the person who made such record * * * testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition, or event, and if, in the opinion of the court, the sources of information, method, and time of preparation were such as to justify its admission." R.C. 2317.40; *see also* Evid.R. 803(6). Evid.R. 901(A) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to

support a finding that the matter in question is what its proponent claims."

{¶ 72} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 50.

{¶ 73} Papke testified that she was a "security analyst" and "custodian of records" with Cincinnati Bell and, in that capacity, she was responsible for processing subpoenas and requests for records. She received such a subpoena from Detective Pigman regarding the records for multiple telephone numbers between March 10 and March 26, 2010. Papke testified that, to obtain the requested records, "[w]e access the various databases depending upon the type of record that is requested. And put those into a pdf format for subscriber in Excel format for the call detail records [sic], and then we send the records through email." Papke testified that she completed this process herself for the records requested by Pigman and "check[ed] for accuracy." She did not provide more specific information about how the information was stored or accessed. Papke then testified about specific records related to a prepaid cell phone number which had been identified as Jackson's cell phone number, explaining the meaning of the codes on the records.

{¶ 74} A witness authenticating a business record must be sufficiently familiar with the operation of the business and with the circumstances of the record's preparation, maintenance and retrieval that he or she can reasonably testify on the basis of this knowledge that the record is what it purports to be, and that it was made in the ordinary course of business consistent with the elements of Evid.R. 803(6). *State v. Jones*, 2d Dist. Montgomery No. 24077, 2011-Ohio-3275, ¶ 12, citing *State v. Hirtzinger*, 124 Ohio App.3d

40, 49, 705 N.E.2d 395 (2d Dist.1997). In this case, Papke's testimony arguably did not encompass all of these points; on the other hand, Jackson did not challenge the extent to which Papke had identified the records and authenticated them. As Papke testified about the records, it became apparent that she was very familiar with Cincinnati Bell's products, with some of the technology involved in tracking the location of a cellular call, and with the records documenting such calls.

**{¶ 75}** Although it would have been better if the State's questions laying the foundation for Papke's testimony were more thorough, we find no abuse of discretion, much less plain error, in the trial court's admission of the Cincinnati Bell records.

**{¶ 76}** The eighth assignment of error is overruled.

**{¶ 77}** Jackson's tenth assignment of error states:

THE TRIAL COURT ERRED IN ALLOWING THE STATE TO USE LEADING QUESTIONS AND IMPEACH THEIR [SIC] OWN WITNESS, THOMAS HORN.

**{¶ 78}** Jackson claims that the State should not have been allowed to impeach its own witness, Thomas Horn, because, although Horn's deposition testimony differed from his prior statements, the State did not show that it was surprised by the change in Horn's testimony. Jackson asserts that "[a]ny reasonable person would have believed Horn would recant, from his prior statements and failure to twice appear for trial."

**{¶ 79}** Generally, a prior inconsistent statement is admissible only to impeach the declarant and should not be offered to prove the truth of the matter asserted. (Citations omitted.) *State v. Risden*, 2d Dist Montgomery No. 22930, 2010-Ohio-991, ¶ 18. When

taken by surprise by testimony from its own witness that causes affirmative damage, a party may impeach its own witness concerning his prior inconsistent statement(s). *Id.*; Evid.R. 607(A).

{¶ 80} Ordinarily, "surprise" can be shown if the testimony is materially inconsistent with a prior statement and the party calling the witness did not have reason to believe that the witness would recant. *State v. Nolan*, 2d Dist. Clark No. 99-CA-24, 2000 WL 262658, *2 (March 10, 2000). "Affirmative damage" is established when the witness testifies to facts which contradict, deny, or harm the trial position of the party calling the witness. *Id.*

{¶ 81} It is within the broad discretion of a trial court to determine whether a party is taken by surprise by the testimony of a witness called by that party, so as to permit that party to impeach its own witness. *State v. Dearmond*, 179 Ohio App.3d 63, 2008-Ohio-5519, 900 N.E.2d 692, ¶ 27 (2d Dist.); *Risden* at ¶ 18.

{¶ 82} At the deposition (which was played at trial), the State claimed surprise after Horn testified that he had not recognized the assailant at the time of the shooting. Horn had previously given a statement to Detective Pigman and testified at the suppression hearing that Jackson was the shooter and was known to Horn because Jackson dated Horn's cousin. The trial court "accept[ed] that given what Mr. Horn had said previously both at – both in writing and also based on what he said at the Motion to Suppress hearing and what he had said to you [the prosecutor] at the pre-trial conference, that there is an affirmative showing of surprise." Thus, the court ruled that the State would be allowed to impeach Horn. The trial court did not address the issue of affirmative damage, but the damage

caused by the change in Horn's testimony was apparent, and Jackson does not argue that the State failed to show affirmative damage.

{¶ 83}  Jackson points out that, in addition to Horn's prior statements identifying Jackson as the shooter, Horn had stated on his 911 call and in his initial conversation with Detective Pigman that he could not identify the shooter.  Based on Horn's differing accounts throughout the history of the case and his lack of cooperation with testifying, Jackson claims that the State could not have been surprised by Horn's deposition testimony.

{¶ 84}  Although Horn did deny knowing the identity of the shooter in the immediate aftermath of the shooting and the early stages of the investigation, he picked Jackson out of a photo array on April 1, 2010, less than two weeks after the shooting.  There is no indication from the record that Horn disclaimed knowledge of the shooter's identity between April 1, 2010 and the day of his deposition testimony.  Moreover, Horn's past assertions that he was "scared" about testifying against Jackson need not have suggested to the State, in themselves, that he was likely to change his testimony; he seemed to be dealing with his fear by attempting to avoid testifying altogether.  We cannot conclude that the trial court abused its discretion in concluding that the State was surprised by Horn's testimony.

{¶ 85}  As part of the same discussion at trial, the trial court suggested that the court would "probably" have allowed the State to call Horn as a court's witness if the State had made such a request, "given the fact that [the State] had to pick him up as a material witness."  Evid.R. 614(A) "authorizes the court to call a witness whom a party might otherwise call, on the party's 'suggestion' that the witness would then recant another, prior statement favorable to that party."  "When the court calls a witness on its own motion, a

party need not satisfy the surprise and affirmative-damage requirements of Evid.R. 607(A) in order to impeach the witness." *State v. Arnold,* 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, at ¶ 44 (2d Dist.), citing *State v. Apanaovich,* 33 Ohio St.3d 19, 514 N.E.2d 394 (1987). Based on this statement, Jackson likely suffered no prejudice as a result of the court's finding that the State was surprised by the change in Horn's testimony; if such a change had been anticipated, it appears that the court would have allowed the State to pursue similar questioning by cross-examining Horn as a court's witness, pursuant to Evid.R. 614(A).

**{¶ 86}** The tenth assignment of error is overruled.

**{¶ 87}** Jackson's eleventh assignment of error states:

APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL DUE

TO PROSECUTORIAL MISCONDUCT.

**{¶ 88}** Jackson claims that the prosecutor engaged in misconduct and deprived him of a fair trial by improperly bolstering Horn's prior statements, by presenting the perjured testimony of Tahira Elamin, by improperly arguing that Horn's prior statements were "evidence to be used to prove the identity of appellant as the shooter," and by commenting in closing argument that details of a phone call Sims received the night of the shooting were unavailable because of a defense objection.

**{¶ 89}** In reviewing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones,* 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'"

*Id.,* quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced and his conviction will not be reversed. *See State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994), overruled on other grounds. We review the alleged wrongful conduct in the context of the entire trial. *State v. Stevenson,* 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

**{¶ 90}** With respect to the "improper bolstering" of Horn's testimony, Jackson claims that the prosecutor "gave the imprimatur of the State" to Horn's prior statements by questioning Horn about his previous meetings with prosecutors (at the suppression hearing and two pre-trial conferences) and asking whether he had identified Jackson as the shooter at those times. After initially stating that he did not recall what he had said on those occasions, Horn admitted that he made such statements. He also admitted telling the State that he was afraid of Jackson and his family, although not with "those exact words."

**{¶ 91}** This exchange did not involve any improper bolstering of Horn's testimony. The State impeached Horn's trial testimony with his prior inconsistent statements, with the court's permission, pursuant to Evid.R. 613. While the questioning brought Horn's prior statements to the jury's attention, it did not vouch for them.

**{¶ 92}** Jackson also claims that the prosecutor engaged in misconduct by presenting the testimony of Tahira Elamin. Elamin lived across the hall from the apartment in which the shooting occurred and was home at the time of the shooting. She testified that, after the shooting, she saw a black male running from the building in a multi-colored jacket.

She was shown a surveillance video of Jackson at a Kroger store on the day of the shooting wearing a multi-colored jacket; she testified that the jacket worn by the person running from her building was similar to the jacket shown in the video.

{¶ 93}    Elamin was also questioned about the physical characteristics of the person who ran from her building.  The day of the shooting, she told the police that the man was "about five-four."  On direct examination, she stated that her estimation of his height had been "a guess," noting that she had been looking down on him from her second floor apartment window.  On cross-examination, Elamin admitted that she had originally described the person she saw running from her building as a black male, 5'4" tall, with a small build, short hair, and a baseball cap; she had only seen the man from the back.

{¶ 94}    Although Elamin's physical description of the person who ran from her building did not match Jackson very well, this fact, standing alone, does not justify defense counsel's suggestions that Elamin committed perjury or that the State knowingly presented perjured testimony.  Moreover, the State elicited testimony which was offered to explain why Elamin might have had a difficult time estimating the man's height: she was looking down on him.  Elamin was much more confident about her description of the multi-colored jacket worn by the man who fled the building and her assertion, after viewing the surveillance video, that it resembled one that Jackson owned.   It was for the jury to determine whether, or to what extent, Elamin's testimony was credible.  The State's use of Elamin's testimony about the physical characteristics of the person she saw running from her building did not constitute prosecutorial misconduct.

{¶ 95}  With respect to closing argument, Jackson contends that the State

improperly commented in its rebuttal closing argument that Horn's prior statements were evidence "to be used to prove the identity of the shooter." The prosecutor did not make such an explicit statement. In the section cited by Jackson, the prosecutor responded to a defense argument about Horn's credibility; specifically, the defense argued that Horn's statement on the 911 call that he did not know the shooter and his later inconsistent statements identifying Jackson as the shooter rendered Horn's testimony unreliable or that, in the alternative, the jury should believe Horn's statements that he did not know the shooter. The State's argument focused on the role fear could have played in Horn's actions and on his reluctance to identify Jackson. There was nothing improper about this argument.

{¶ 96} Jackson's final argument relates to Sims's testimony that he (Sims) received a call in the early morning on March 20, 2010, which made him concerned that his gun had been used in a shooting. The prosecutor stated in her rebuttal closing argument: "[Defense counsel] said [in closing argument] you didn't hear anything about – anything about details of that [conversation] * * *. And you know why? Defense counsel objected, objected to that part." This was improper argument. It suggested that there was something in the conversation between Sims and the caller that would have prejudiced Jackson and that was kept from the jury by Jackson's objection.

{¶ 97} Defense counsel objected to the prosecutor's statement, the objection was discussed at sidebar, and the objection was sustained. When the prosecutor continued her closing argument, she merely stated that "the things that might have been talked about" during this phone call were "pure speculation." The trial court later instructed the jury that it should not speculate as to the court's reason for sustaining an objection. In our view,

there is no possibility that this comment affected the outcome of the trial.

{¶ 98}   The eleventh assignment of error is overruled.

{¶ 99}   Jackson's ninth assignment of error states:

APPELLANT'S CONVICTION MUST BE REVERSED DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 100}   Jackson contends that, in numerous instances, his attorney did not object to the admission of improper evidence or to prosecutorial misconduct, and that these instances deprived him of a fair trial. Jackson has not presented an argument as to how counsel's response to each of the listed comments was unreasonable or affected the outcome of the trial; he has simply provided a list of statements or questions to which, he believes, counsel should have objected. Such an argument does not comport with App.R. 16(A)(7). Nonetheless, we will briefly address these statements.

{¶ 101}   We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland,* 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable

in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

{¶ 102} Jackson argues that his attorney was ineffective in failing to object to Detective Pigman's hearsay testimony that Horn had identified Jackson in a photo array, that Sims had identified Jackson in a photo array, and that Paula Papke was the custodian of the Cincinnati Bell records. Insofar as Horn, Sims, and Papke confirmed these facts in their own testimonies, there is no reasonable probability that the outcome of the trial would have been different but for Pigman's statements.

{¶ 103} Jackson also claims that counsel should have objected to Pigman's testimony that, in a cell phone call with Jackson that was conducted in Pigman's presence and recorded by Pigman, Sims told Jackson – at Pigman's prompting – that Sims needed his gun back. Pigman did not testify about Jackson's response, if any, to this statement. Sims testified that he did not get his gun back from Jackson. In our view, this statement by Sims (as recounted by Pigman) was not hearsay because it was not offered for the truth of the matter asserted. Moreover, because Jackson's response to the statement was not revealed, Jackson suffered no prejudice as a result of this testimony.

{¶ 104} Jackson also contends that counsel should have objected to Papke's testimony, because she did not "properly authenticate her [Cincinnati Bell] records as business records." We addressed the authentication of these records under the eighth assignment of error, and we do not believe that an objection by counsel would have led to the exclusion of the records or otherwise affected the outcome of the trial.

{¶ 105} Pigman's statement that he verified Sims's ownership of the murder weapon through an ATF agent was of no consequence to Jackson, as there was no dispute as to the ownership of the gun. Thus, counsel's failure to object to this statement was not ineffective.

{¶ 106} Jackson claims that his attorney was ineffective in failing to object to Pigman's testimony about the Cincinnati Bell phone records. Specifically, Pigman testified about his efforts to verify phone calls Jackson claimed to have made related to his alibi (for example, calling a friend for a ride to Kettering in the late afternoon of March 19, 2010) and the location of the cell phone on March 19 and 20, 2010. Jackson claims that counsel should have objected to Pigman's testimony about what he learned from the phone records, although he does not suggest on what basis such an objection should have been made. Our review of the record reveals that counsel did object several times to Pigman's testimony about the phone records, but these objections were overruled. Counsel was not ineffective in failing to object.

{¶ 107} Jackson's last argument about ineffectiveness related to Pigman's trial testimony is that Pigman stated, with respect to his third interview with Horn, that none of the information provided by Horn "changed from what [Horn] had said in the previous two interviews." Counsel did not object to this statement. Again, Jackson has not stated on what basis an objection should have been made, and it is not apparent that this statement was harmful to Jackson's case. We cannot conclude that counsel was ineffective in failing to object to this statement or that the outcome of the trial likely would have been different if counsel had objected.

{¶ 108}    Jackson's remaining arguments allege ineffective assistance in counsel's failure to object to the State's questioning of Horn during his deposition about (1) Horn's prior inconsistent statements to prosecutors, (2) Horn's fear of testifying against Jackson, (3) his failure to appear in court on previous occasions, and (4) the State's impeachment of Horn's "credibility" about the identity of the shooter.  Jackson also suggests that defense counsel should have impeached Horn at the deposition with his prior testimony at the suppression hearing, wherein Horn stated that he did not know if the shooter was wearing a mask.

{¶ 109}    Both the State and defense counsel were in difficult positions in handling Horn's testimony, because they sought to persuade the jury of the credibility of some of Horn's statements about the identify of the shooter, while discrediting or explaining other inconsistent statements.  Under such circumstances, we have held that the failure to object is within the realm of reasonable trial tactics and, therefore, does not definitively establish deficient performance by counsel.  *State v. Risden*, 2d Dist. Montgomery No. 22930, 2010-Ohio-991, ¶ 179, citing *State v. Gray,*  2d Dist Montgomery No. 20980, 2007-Ohio-4549.  Further, we can only speculate as to whether further questioning or lodging of objections during Horn's testimony would have bolstered or diminished the parts of his testimony upon which Jackson sought to rely.  As such, we find no ineffective assistance in trial counsel's handling of Horn's deposition testimony.

{¶ 110}    Jackson's ninth assignment of error is overruled.

{¶ 111}    Jackson's fourth and fifth assignments of error state:

APPELLANT'S   CONVICTION   WAS   AGAINST   THE   MANIFEST

WEIGHT OF THE EVIDENCE.

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S CONVICTION.

{¶ 112} Jackson challenges both the sufficiency and the weight of the evidence against him.

{¶ 113} An argument based on the sufficiency of the evidence challenges whether the State presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1999). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 114} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st

Dist.1983); *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44.

**{¶ 115}** Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.*

**{¶ 116}** The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**{¶ 117}** The State presented the following evidence at trial:

**{¶ 118}** Several witnesses testified that, on the afternoon and evening of March 19, 2010, Antoine West and several of his friends, including Jeremy White, Thomas Horn, and Kimberly Carl, had been "hanging out" together at the Deer Creek apartment complex in Trotwood. White's girlfriend, West's mother, and Carl all lived in separate units of the apartment complex, and the friends spent time in several apartments. West sold marijuana to numerous people throughout the day and was seen with a large amount of cash.

**{¶ 119}** Later in the evening, White, Horn, Carl, and West were at West's mother's apartment, Unit 4716. Between 10:00 and 10:30 p.m., White left to return to his girlfriend's apartment. West, Horn, and Carl were watching television in the dark when, according to Carl and Horn, someone opened the apartment door without knocking or using

force; the person "came in * * * smooth" and was several steps inside the apartment before he was noticed. He then ordered the occupants to "lay down" and pointed a gun at them. Carl and Horn moved toward the kitchen, where they attempted to conceal or shield themselves under some blankets near the washer and dryer, while West lunged toward the intruder. Carl and Horn heard some "tussling" and some shots fired. Carl and Horn did not hear anyone leave the apartment, so they waited a short time to come out from under the blanket. When they did, they found West, wounded, in the foyer of the apartment, with his pants partially pulled down and the pockets pulled out. They testified that West's pockets had not been pulled out earlier.

{¶ 120} Horn called 911 on his cell phone from the exterior hallway of the apartment building, but he left before the police arrived. In his 911 call, he claimed not to know the identity of the shooter.

{¶ 121} A neighbor, Tahira Elamin, and her guest, Alan Webb, were in the unit across the hall from Unit 4716 at the time of the shooting. They hid in a bedroom until the shooting stopped; then Elamin heard "rumbling" down the exterior stairwell and looked out the bedroom window. She saw an African-American man running from the building toward a gold car parked in the lot; the man was wearing a multi-colored jacket. When Webb and Elamin opened the door to Elamin's apartment moments later, they saw West in the foyer of the neighboring apartment, bleeding, and observed Horn (and possibly Carl) calling 911.

{¶ 122} When police officers responded to Unit 4716, they found West seriously wounded and lying in the foyer of the apartment. Carl was present, but Horn was

not. The initial EMT responders called for CareFlight, but West was pronounced dead at the scene a short time later. West had been shot in the top of his head, in his chest, and in his left hip and thigh. Shell casings were found in the vicinity of the body and at various places around the main room of the apartment. There was no money in West's pockets at the time of his death.

{¶ 123} Later that night, a detective found a Springfield Armory .45 caliber gun in a grassy area of the apartment complex; forensic evidence linked the gun to West's shooting.

{¶ 124} Dion Sims, an acquaintance of Jackson, testified that he was the owner of the Springfield Armory handgun. He further testified that Jackson had asked to borrow the gun on the evening of March 19, 2010, and Sims had given it to him. Sims became concerned early the next morning when a phone call from a friend alerted him to the fact that the gun may have been used in a crime at the Deer Creek Apartments. Sims attempted to go to the apartment complex to look for the gun, but he was deterred by the heavy police presence when he approached. Sims contacted an attorney who helped him arrange a meeting with the police, because he was afraid he would be blamed for the crime. Jackson never returned the gun to Sims.

{¶ 125} When Horn was identified and located by the police, he initially claimed that he could not identify the shooter. However, he subsequently contacted Detective Pigman and identified Jackson, who was the boyfriend of one of Horn's cousins, as the shooter. Horn also identified Jackson in a photo array prepared by Detective Pigman. Horn indicated to Pigman that he was fearful about testifying against Jackson. Horn gave a

deposition after he was arrested on a material witness warrant; in his deposition, which was played at trial, he claimed not to recall having identified a shooter, but acknowledged that he had made prior statements identifying Jackson.

{¶ 126} When he was interviewed by the police, Jackson claimed that he had been staying with his son's mother, LaKesha Gray, in Kettering at the time of the shooting. Gray remembered the week well because her sister had died on March 15, and the funeral had taken place on March 20. After the funeral, Jackson had asked her to tell the police that he was with her from March 15 - 20. Gray initially lied to the police for Jackson, but when she learned from one of the detectives that they were investigating a homicide, she admitted that her earlier statement had been untrue. Jackson's cell phone records also indicated that he had been near Trotwood, not in Kettering, at the time of the shooting.

{¶ 127} Jackson's girlfriend at the time of the shooting told police that she and Jackson had been at a Kroger store on Seibenthaler Avenue around noon on the day of the shooting. Using this information, the police obtained a March 19 surveillance video from the store. In the video, Jackson was wearing a multi-colored jacket. At trial, Elamin was asked whether the jacket in the video resembled the jacket she had seen on the man who ran from her building the night of the shooting; she answered affirmatively.

{¶ 128} There was no DNA or other forensic evidence linking Jackson to the shooting. Jackson was excluded as the contributor of DNA found in scrapings under one of West's fingernails and in West's pockets.

{¶ 129} Although much of the evidence against Jackson was circumstantial,

circumstantial evidence and direct evidence are of equal value, especially because some facts can only be proved by circumstantial evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991). The State's evidence, if believed by the jury, would convince the average mind of the defendant's guilt beyond a reasonable doubt. Thus, Jackson's conviction was not supported by insufficient evidence. Further, we cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice by weighing the evidence as it did. Accordingly, Jackson's conviction was not against the manifest weight of the evidence.

{¶ 130} The fourth and fifth assignments of error are overruled.

{¶ 131} The sixth assignment of error states:

THE TRIAL COURT ERRED IN FAILING TO MERGE THE SENTENCES HEREIN TO A SINGLE SENTENCE OF 15 TO LIFE FOR MURDER CONSECUTIVE TO 3 YEARS FOR THE FIREARM SPECIFICATION.

{¶ 132} Jackson contends that the trial court should have merged all of the counts of which he was convicted into the murder, because they were "all part of a single course of conduct." The trial court only merged the counts of murder and felonious assault at sentencing; the counts of aggravated burgalry and aggravated robbery were not merged with the murder. Jackson claims that each of the predicate offenses of felonious assault, aggravated burglary, and aggravated robbery should have merged "with its corresponding murder charge" before the murder charges were merged.

{¶ 133} The merger of offenses is governed by R.C. 2941.25, which is a "prophylactic statute that protects a criminal defendant's rights under the Double Jeopardy

Clauses of the United States and Ohio Constitutions." *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 45. R.C. 2941.25 provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 134} The defendant bears the burden to prove entitlement to merger. *State v. Thomas,* 10th Dist. Franklin No. 10AP-557, 2011-Ohio-1191, ¶ 16.

{¶ 135} In *Johnson,* the Supreme Court of Ohio announced a new manner of applying R.C. 2941.25 to determine when offenses are allied offenses of similar import that must be merged. It abandoned the previous test, set forth in *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999), which called for a comparison of the statutory elements solely in the abstract. *Johnson* held that, when determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered. *Id.* at ¶ 44. The Supreme Court explained:

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one

offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. *State v. Blankenship* (1988), 38 Ohio St.3d 116, 119. (Whiteside, J., concurring) ("It is not necessary that both crimes are always committed by the same conduct but, rather, it is sufficient if both offenses *can be* committed by the same conduct. It is a matter of possibility, rather than certainty, that the same conduct will constitute commission of both offenses." [Emphasis sic] ). If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." *State v. Brown,* 119 Ohio St.3d 447, 2008-Ohio-4569, at ¶ 50 (Lanzinger, J., dissenting).

If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.

Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R .C. 2941.25(B), the offenses will not merge.

*Johnson* at ¶ 48–51.

{¶ 136}     Jackson contends that all of his offenses should have merged into the murder offense because all of his actions were "part of a single course of conduct." We disagree.

{¶ 137}     Since *Johnson* was decided, we have held that aggravated robbery and aggravated burglary often are not allied offenses of similar import, and therefore do not merge for sentencing, because the a burglary is complete upon entry into the victim's home, and a robbery subsequently committed inside the home constitutes a new, separate offense. *State v. DeWitt*, 2d Dist. Montgomery No. 24437, 2012-Ohio-635, ¶ 33; *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 23. *Turner* and *DeWitt* were similar to this case in that they involved an unauthorized entry into an apartment for the purpose of robbing its occupant. Under these facts, and based on these prior holdings, Jackson was not entitled to merger of the counts of aggravated burglary and aggravated robbery.[7]

{¶ 138}     Using the same rationale, we conclude that the aggravated burglary was not an allied offense of murder; the burglary was complete when Jackson entered the apartment, and the subsequent murder was a new, separate offense. Also, it is not possible to commit murder by the same conduct as aggravated burglary. *See DeWitt* at ¶ 34

---

[7] *Turner* and *DeWitt* discuss the merger of aggravated burglary and aggravated robbery in very broad terms. Although a burglary will often be completed before a robbery occurs, as discussed in those cases and in this case, we recognize that, in some circumstances, these offenses can be committed by the same conduct and are allied offenses. *See, e.g., State v. Bridgeman*, 2d Dist. Champaign No. 2010 CA 16, 2011-Ohio-2680, wherein a bank was open for business when the defendant entered. In *Bridgeman*, no trespass existed when the defendant initially, with privilege, entered the bank during regular business hours, but we implicitly found that a trespass occurred when the defendant, without privilege, remained on the premises to rob the bank; under those facts, the offenses of aggravated robbery and aggravated

(aggravated burglary did not merge with felonious assault or involuntary manslaughter, because the burglary was complete upon entry and the other offenses were committed separately in time).

{¶ 139}    The question of whether the aggravated robbery should have merged with the murder is more difficult.  Jackson was convicted and sentenced for murder, in violation of R.C. 2903.02(B), and aggravated robbery, in violation of R.C. 2911.01(A)(3).  R.C. 2903.02(B) states, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."  R.C. 2911.01(A)(3), the relevant aggravated robbery statute, provides, "No person, in attempting or committing a theft offense,  * * * , or in fleeing immediately after the attempt or offense, shall do any of the following: * * * (3) [i]nflict, or attempt to inflict, serious physical harm on another."  Each offense requires an act of violence, and it is possible that the victim could die from the serious physical harm inflicted in the course of the aggravated robbery, resulting in the victim's murder.  Thus, it is possible to commit murder under R.C. 2903.02(B) and aggravated robbery under R.C. 2911.01(A)(3) with the same conduct, and thus the first prong on the *Johnson* test is satisfied.  *State v. Diggle*, 3d Dist. Auglaize No. 2-11-19, 2012-Ohio-1583, ¶16, citing *State v. Irbey,* 6th Dist. Lucas No. L-10-1139, 2011-Ohio-2079, ¶ 21.

{¶ 140}    Because it is possible to commit murder and aggravated robbery with the same conduct, we must examine Jackson's conduct to determine whether he did, in fact, commit the two offenses with the same conduct and the same animus.  *Johnson* at ¶

burglary merged.

50-51. Several courts have held that, where the force used to effectuate an aggravated robbery is far in excess of that required to complete the robbery, or where the circumstances suggest that a separate intent to kill existed, the offenses of aggravated robbery and murder do not merge. *See Diggle* (evidence of prior conflict with victim and defendant's use of force in excess of that required to complete robbery found to demonstrate separate animus for murder); *State v. Ruby,* 6th Dist. Sandusky No. S-10-028, 2011-Ohio-4864, ¶ 61 (beating of elderly, disabled victims demonstrated separate animus for aggravated robbery and attempted murder, because the beating far exceeded that necessary to effectuate the robbery); *State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 48 (shooting victim in face and head from close range during course of aggravated robbery demonstrated a specific intent to kill).

{¶ 141} Under the facts presented in this case, the trial court could have reasonably concluded that Jackson's use of force exceeded that necessary to complete the robbery or that he had a separate intent to kill West. West was shot four times as he lunged toward the shooter in an apparent attempt to thwart the robbery; when one of these shots was fired, the gun was in contact with the top of West's head. This degree of force suggests the use of force in excess of that required to effectuate the robbery. Alternatively, if West was targeted because he was a drug-dealer, Jackson may have assumed that West was armed and chose to use deadly force to ensure his own safety. Under either view of the events, the trial court could have reasonably concluded that the intent to kill was separate from the intent to commit robbery. Thus, the trial court did not err in refusing to merge the murder and the aggravated robbery.

**{¶ 142}**     The sixth assignment of error is overruled.

**{¶ 143}**     The judgment of the trial court will be affirmed.

. . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Andrew T. French
James S. Armstrong
Hon. Michael L. Tucker